**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |  |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **DJAVIER DUGGINS** | Case No. 18-cr-10450-MLW |

**DEFENDANT, DJAVIER DUGGINS' SECOND MOTION TO REVIEW HIS ORDER OF DETENTION, ON NEW GROUNDS, SEEKING HIS IMMEDIATE RELEASE BASED UPON A VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

**INTRODUCTION**

> "[I]n . . . most cases, **sixteen months** [in custody] would be found to exceed the due process limitations on the duration of pre-trial confinement."

United States v. Zanino, 798 F.2d 544, 548 (1st Cir. 1986) (emphasis added); United States v. Gonzales Claudo, 806 F.2d 334, 341 (2nd Cir. 1986) (Detention of 14 months and which is scheduled to last considerably longer, points strongly to a denial of due process) citing Zannino, at id;  See also United States v. Souza, 749 F.3d 74, 81-82 (1st Cir. 2014) (18 month delay between arraignment and trial establishes a presumption of prejudice, triggering further Sixth Amendment review); citing Doggett v. United States, 505 U.S. 647, 652 n.1 (1992) (Generally, delay becomes prejudicial, triggering a Sixth Amendment inquiry under Barker v. Wingo, 407 U.S. 514 (1972) around the one-year mark).

In the instant matter, the Defendant, Djavier Duggins (hereinafter, "the Defendant" or "Duggins"), a person who has been held in detention awaiting trial for over **sixteen months** now, asserts that his period of confinement has transgressed over into an issue of constitutional

1

dimension, now implicating his due process rights, and which now requires his immediate release. As a result, he "NOW COMES", by and through his counsel, and respectfully moves this Court, pursuant to 18 U.S.C. §§ 3145(b) and 3142(f) to review his detention status, with the consideration of his Fifth Amendment due process constitutional rights in mind.

## PROCEDURAL HISTORY[1]

On November 28th 2019, the Defendant was indicted with a violation of 18 U.S.C. § 1962(d) – Conspiracy to Conduct Enterprise Affairs through a Pattern of Racketeering Activity. On the same day the Defendant was arrested, and on November 29th 2018, the government moved to detain him without bond. *Dkt. entry # 21.* On December 7th 2018, the Defendant consented to a voluntary order of detention without prejudice. *Dkt. entry # 42.* On July 29th, 2019 the Defendant moved for a hearing on his detention status. *Dkt. entry #71.* Following a hearing on July 30th, 2019 the Magistrate Judge (Boal), ordered him detained (*Dkt. entry #77*) stating the following:

*Dangerousness*

The Defendant is an admitted "former" member of MS-13. He has two convictions for two violent offenses, before he states that he withdrew from the gang. Upon review of his board of probation record, we see that one conviction was for an assault by means of a dangerous weapon in 2010 – when he was 20 years old. The second was for an armed assault with the intent to murder in 2012 – when he was 23 years old. These temporally dated crimes have been alleged by the government to have been done while Mr. Duggins was a member of the criminal

---

[1] This procedural history is taken, at least in large part, and "verbatim", from Duggins' first "Motion to Review Order of Detention" (*Dkt No. 92*), which was filed with the Court on October 29, 2019, after Magistrate Boal ordered Duggins detained, with written findings generated on about July 31, 2019. (*Dkt No. 77*). This first "Motion to Review" was merely a request by Duggins to seek judicial review of the Magistrate findings under 18 U.S.C. sec. 3145 (b). As of present, no ruling has been made on his first motion. This second motion for review, while alleging new grounds regarding a due process violation, still must rely upon the same procedural history as his first motion, but this time also includes the procedural posture of the case --"*post Dkt # 77*", as further support thereof.

enterprise in question. These factors, albeit *pre-withdrawal*, appear to be at the crux of the Magistrate's reasons that Mr. Duggins poses a present danger. After hearing, the Magistrate found that presently no member of the community, individually or at large, is safe, and made this finding based upon the following:

> "The instant charges raises significant concerns as it suggests continued gang involvement"

*See page 4 of Magistrate's Boal's decision on detention.*

***Relevant information not included in dangerous finding***

Upon review of the minutes of the Detention Hearing (*Dkt. entry #86),* however, we see a wealth of information not included in Magistrate Boal's findings. In particular, and since his last crime in 2012, Duggins has **turned over a new leaf on life** – as during his arrest in 2018, Duggins confessed to law enforcement that he had withdrew from any membership within the alleged criminal enterprise.[2] To corroborate this claim of turning over a new leaf, Mr. Djavier Duggins presently stands before this Court as a 31 year old man, with no further convictions since his claimed withdrawal, and which is also coupled without any claims by the government that Duggins has committed any violent conduct since he withdrew.

Additionally, and to further support Duggins' contention that he withdrew, at the time of his arrest, Duggins was gainfully employed, working approximately 50 hours a week, and had an extended family (a serious girlfriend and three children) that he was taking care of. *See again, the testimony of J. Marcotte owner of Select Airport Parking – at page 57 of Dkt. entry 86; see also the testimony of C. Valladares, at pages 68-70.* The Defendant's days, according to the live

---

[2] See the testimony of Mr. J. Marcotte, and C. Valladares, beginning at pages 54 and 65 of the detention transcript, respectively, and which speak about who Mr. Duggins is today. Upon review of the same, the Defendant suggests that we see a testament of a man who has certainly turned a corner, as it relates to a transformation from who he was in a previous life.

testimony from both of the aforementioned witnesses, consisted of going to work – toiling seven days a week and sometimes working double shifts when he could get them, and where in between shifts he would be dropping off and picking up young kids from school.[3] None of the Defendant's present style of life as dictated by these witnesses are in factual dispute. In fact, Mr. Duggins' employer testified at the detention hearing, and not only confirmed Duggins' work schedule and stellar performance as an employee, but also told the Magistrate that because of Mr. Duggins' work ethic, he would be willing to re-employ him – even after hearing all about what the government has alleged about him, and was indifferent to the same, claiming that "this is not the Djavier I knew".[4] This would suggest that perhaps the government's account is not only an uncorroborated distortion of who he presently is, but an unreliable one as well. Lastly, Mr. Duggins' girlfriend testified at the detention hearing as well, chronicling what she has seen since he has withdrawn from MS-13 – a real man and father, and in contravention to who Mr. Duggins was as a boy.[5]

***Risk of Flight***

The Magistrate also found that "no condition or combination of conditions of release will reasonably assure the appearance of the defendant as required". *See page 4 of the Magistrate's decision.* However, and in support of this finding, the Court also found the following facts:

  a. Duggins has lived in Massachusetts for over fifteen years;
  b. His mother, father, three half-siblings, girlfriend, and son also live in Massachusetts;
  c. He has five other half-siblings that live outside of the United States;

---

[3] *Dkt. # 86 at pages 57-58; 68-69.*

[4] *Id. at page 60.*

[5] *Id. at pages 68-73.*

    d.  He has a United States passport but last traveled outside of the country 17 years ago;

    e.  He has "probation violations" ;[6] and

    f.  He faces a "potentially" lengthy sentence if he is convicted in this case.[7]

All of these factors notwithstanding, it's still unclear why Duggins would present any risk of flight, where he has strong ties to the community, does not appear to travel often, and somehow he is believed to more likely flee than not, merely because he violated his terms of probation (on very minor misdemeanor charges) when he was barely an adult. Duggins further believes that if only being "potentially" exposed to a long prison sentence were the standard for finding risk of flight, there would never be any conditions of release which would provide a cure for this risk. Duggins does not believe that exposure to a lengthy jail sentence controls the inquiry. See e.g., United States v. Cruz, 363 F. Supp. 2d 40, 46-47 (D. Ct. Puerto Rico 2005) (Cruz being exposed to a 30 year jail sentence insufficient to warrant a finding a risk of flight, when even accompanied by: a) an extramarital affair outside of Puerto Rico; b) having two expired drivers licenses and two passports in his possession; as well as c) two bogus resumes).

    Moving forward from the Magistrate's order of detention of July 31, 2019, the following

---

[6] Another review of Duggins' Board of Probation Record shows these violations took place in 2008 (over a decade ago) while he was on probation for simple possession of Marijuana and Disorderly Conduct – resulting in a 4 month prison term. He was 18 years old at the time of these brief prison sentences. It is also noteworthy to mention that Mr. Duggins was on more "serious" probation – for three years, after he was released from jail for his 2012 conviction for armed assault with intent to murder. Mr. Duggins proved himself obedient to those terms and conditions of his probationary period and was thereafter terminated from probation a year early (in 2018) and without one violation. This would all demonstrate that Mr. Duggins appears to have matured since his earlier and more youthful days while involved in gang activity.

[7] The maximum sentence for a conviction of 18 U.S.C. sec. 1962 (d) is 20 years. However, a conviction for a general RICO conspiracy, would set a base offense level of "19", and with Duggins' estimated CHC of III, (without any enhancements) his sentence could be as low as 27 months. Duggins does understand that the government has different plans for him by way of sentencing. One would assume that the government intends to put the actions of Duggins' co-conspirators on his plate (which could include Murder) and via this relevant conduct ratchet his sentence up to the 20 year maximum. This would be the case although Duggins is not alleged to have committed any acts of violence in the last 8 years and counting. In response, Duggins is not phased by the government's desires, as he maintains that they cannot show that since he was released from jail in 2016, he conspired with MS-13 members to commit racketeering acts, let alone was the leader of a group who decided to kill a fellow member, but yet keep him in the dark about it at the same time.

has taken place with respect to his case:[8]

1) On September 12, 2019, an interim status conference took place where the government represented the following:

   a. Other materials (lab reports etc.) are not yet in the government's possession, and will be made available when received;

   b. The government's investigation continues, and where they anticipate additional discovery materials to be produced in the weeks and months ahead;

   c. The government also reports that five of the six defendants (excluding Duggins) need to go through capital case review, and that they anticipate making its final submission to the Capital Case Section this month, and it anticipates that a few months will be necessary to receive a decision from the Attorney General's office;

   d. The government also anticipated filing a *joint* request to continue the interim status conference on September 12, 2019, seeking a further status conference in 60-90 days. However that anticipation was thwarted by Duggins' *objection* to exclude the time during the period

2) On September 13, 2019 a "partially assented to" motion to exclude time between interim status conference dates was filed by the government as to all co-defendants (except Duggins). *See Dkt. 79*

3) On September 19, 2019, Magistrate Boal granted Dkt. 79 and excluded the time as to all defendants, including Duggins, citing 18 U.S.C. 3161 (h)(7)(A) – ends of justice outweighing the defendant's interest in a speedy trial.

4) On October 29, 2019, Duggins filed a Motion for Reconsideration on the Order of his Detention, along with a Motion to Sever his case from his co-defendants, who reportedly were under capital review, and where he was not. *See Dkt. 92-94*.

5) On December 12, 2019, an interim status report took place (*Dkt Entry 113*) wherein the following was represented by the government:

   a. Defense counsel are continuing to review the discovery produced to date and believe (except for Duggins) that additional time is necessary to review the evidence, investigate available defenses, file potential pretrial motions and prepare the case for trial;

---

[8] This further procedural history comes from the docket entries in this case, and will merely demonstrate how Duggins got to this point of a 16 month detention – none of which can be attributed to any action or inaction by him, but rather, quite the opposite.

6

      b.  All parties (except for Djavier Duggins) believed that a further status conference is necessary and additional time should be excluded under the Speedy Trial Act because doing so would be in the interests of justice;

      c.  As things stood, the government and all defendants (except for Duggins) requested that the Court set a further status conference in approximately 90 days and exclude all time until the further status conference because the ends of justice service by the granting of this request, and the defendants in a speedy trial;

      d.  The Court set additional status conferences on March 3, May 7, and June 2nd, and excluded the time between December 12, 2019 and June 2nd, but ***over the objection of Duggins.***

6)  On March 3rd, 2020, another interim status conference was convened (*Dkt Entry 122*) where the parties agreed to file a proposed motion schedule, with a possible hearing date of May 7th, 2020, and with the time previously being excluded as described above. Duggins again lodged his ***objection*** to this exclusion applying against him.

The place where we have now arrived is that Mr. Djavier Duggins has been detained on this case since November 28, 2018, and once he realized that it appeared that nobody wanted a speedy trial but him, he has been repeatedly and consistently asserting this right guaranteed to him by the Sixth Amendment to the United States Constitution.[9] This assertion has spanned the duration of: a) three separate status conferences; and b) while in the middle of it all, attempting to sever his case from his disparately situated co-defendants, and all with a design to go to trial as soon as possible. It would appear that the government, along with his co-defendants, are both content with keeping the train in the station, while they either wait for the government to "complete their investigation", wait for Capital Case Reviews to be completed, or for lab reports to be generated.

Mr. Duggins wants his day in court, and he has executed his fair-share of legal maneuvering in order receive this day timely, and with this instant motion being his most recent

---

[9] The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ***speedy*** and public trial." U.S. Const. amend. VI (emphasis added).

effort, as he now believes that his continued detention without a trial violates his Fifth Amendment rights to due process.

## ARGUMENT

### I.

**THE DEFENDANT IS ON SOLID GROUND WHEN HE STATES THAT HIS PERIOD OF DETENTION WITHOUT A TRIAL HAS BECOME EXCESSIVE, AND HAS OFFENDED DUE PROCESS, NOW CALLING FOR HIS RELEASE**

*Can prolonged pre-trial detention amount to a due process violation?*

Courts have long held that prolonged pre-trial detention may become excessive and consequently punitive so as to offend due process constraints. United States v. Zannino, 798 F. 2d 544, 547 (1st Cir. 1986); United States v. Accetturo, 784 F.2d 382, 388 (3rd Cir. 1986); United States v. Orena, 986 F.2d 628, 630 (2nd Cir. 1993); United States v. Theron, 782 F. 2d 1510, 1516 (10th Cir. 1986); United States v. Gelfuso, 838 F.2d 358, 359-60 (9th Cir. 1988); United States v. Hare, 873 F. 2d 796, 801 (5th Cir. 1989); See also United States v. Daniels, No., 98-30040-MAP, 2000 WL 1611124 at **3-6 (D. Mass. Oct. 5, 2000).

In some cases, due process violations have actually been found and the defendants ordered released due to their prolonged detention. See e.g., United States v. Ojeda Rios, 846 F.2d 167, 168-69 (2d Cir. 1988); United States v. Gonzales Claudio, 806 F. 2d 334, 341-43 (2nd Cir. 1986); United States v. Shareef, 907 F. Supp. 1481, 1482-85 (D. Kan. 1995); United States v. Chen, 820 F. Supp. 1205, 1207-12 (N.D. Cal 1992); United States v. Gatto, 750 F. sup. 664, 672,76 (D.N.J. 1990); United States v. Gallo, 653 F. Supp. 320, 334-15 (E.D.N.Y. 1986). That said, determinations concerning due process limitations on pre-trial detention require a case-by-case assessment. Zannino, 798 F. 2d at 547 ("due process judgments should be made on the facts of individual cases").

*The factors to consider before finding a violation*

The First Circuit espoused in <u>Zannino</u> two types of criteria to guide District Courts in their determination of whether due process requires release. First, "due process judgments . . . should reflect the factors relevant to the initial detention decision, such as the seriousness of the charges, the strength of the government proof's that defendant poses a risk of flight or danger to the community and the strength of the government's case on the merits." <u>Zannino</u>, at 547. Second, "these judgments should request such additional factors as the length of the detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has added needlessly to that complexity." <u>Id.</u>, <u>citing</u> <u>United States v. Accetturo</u>, 783 F.2d 382, 388 (3rd Cir. 1986).

    **a. Seriousness of the charges, strength of the government's proof of dangerousness, and strength on the merits.**

There can be no dispute that the criminal charge here -- that the Defendant agreed (or conspired) with members of MS-13 to commit the racketeering acts listed in the indictment are serious. Nobody is debating otherwise. However, what is the subject of debate is whether people charged with serious crimes are so dangerous that its "clear and convincing" that no set of conditions could assure the safety of the community. *See* 18 U.S.C. § 3142(f) (imposing a clear and convincing burden on the government to prove dangerousness). See <u>Daniels</u> <u>supra</u>, 2000 WL 1611124 *6, fn. 5 (quoting *United States v. Phillips*, 732 F. Supp. 255, 266 (" 'Congress did not declare that the community is entitled to assurances of freedom from all harm, and a court cannot detain arrestees on the mere apprehension of danger or harm. Rather, the court's inquiry must focus on whether by conditions of release the community can reasonably be assured of its safety.'"); See also <u>United States v. Patriarca</u>, 948 F. 2d 789, 792 (1st Cir. 1991) (1st Circuit agreeing with Judge Wolf's assessment that essentially, although *in theory* a Mafia Boss was an

intimidating and highly dangerous character, the government had not demonstrated that *this Boss* posed a significant danger, or at least not a danger that could not be overcome given appropriate conditions).

When considering the government's proof of dangerousness, and strength on the merits, and upon a second look at Mr. Duggins' detention hearing, we do see specific allegations made by the government to support its theory of the Defendant's alleged gang involvement and subsequent finding of being a dangerous person. These allegations are as follows:

a) That he is the present leader of the SLS clique of MS-13; *Dkt. 86 at page 18.*

b) Duggins has recruited a particular member – "Perverso" to join MS-13; *Id. at 19.*

c) Telephonic communications between Mr. Duggins and other co-conspirators of unknown substance; *Id. at pages 32-34* and

d) In the aftermath of a murder committed by alleged members of the enterprise (where it is not claimed that he participated in), the Defendant checked the area to see if cameras were in the area; *Id. at page 22.*

The problem with this cache of evidence, is not only a deficiency regarding "strength on the government's proof on dangerousness", but also on the "strength on the merits" as well as the fact that the government has absolutely no evidence to corroborate any of it.[10] The Defendant of course, does not mean to suggest that the Government must have corroborating evidence at this stage. However, the weight of the evidence is still a relevant consideration for detention. *See* 18 U.S.C. sec. 3142(g)(2). In fact, the weight of the evidence has such a degree of importance, that it can serve as grounds for a reversal of a Magistrate's Order of Detention. See e,g., United States v. Simone, 317 F. Supp. 2d 38, 42 (2004) (Wolf, J.) (This court reversing a Magistrate's Order of Detention, where the order did not properly consider the weight of the

---

[10] *See pages 46-51of Dkt. entry #86* -- the testimony of FBI Agent Michael Little, who repeatedly failed to provide any information that the government's investigation had in their possession which corroborated any of the claims made by PERVERSO.

evidence, and, particularly did not address at all the important evidence of the defendants' conduct since they were first charged with the crimes at issue).  The Defendant claims that he finds himself similarly situated as the Defendant in <u>Simone</u>, as Duggins most recent behavior in society was not considered against the paper-thin quantum of evidence regarding dangerousness against him, and particularly since his withdrawal from MS-13.

***The weight of the evidence against Duggins is paper-thin.***

Frankly, when the Defendant states that the weight of the evidence against him is paper thin, what he means to say is that the weight of the entire evidence presented falls upon the shoulders of a confessed killer – Henri Salvador Guiterrez a/k/a – "PERVERSO" – a man whom the Defendant claims puffed and boasted about his crimes to a cooperating witness, and without one ounce of independent evidence to corroborate it.   In essence, PERVERSO's puffery has made claims about Duggins, which just have no support in the government's thorough investigation into this matter.

For example, PERVERSO has claimed that Duggins is the present leader of PERVERSO's specific clique.  However, the government has failed to come up with one supporting piece of evidence to support the Defendant's alleged leadership status namely: a) the authorization of any criminal activity; b) the calling of meetings; communication with El-Salvador, or c) the management of the affairs of the enterprise. *Dkt. 86 at pages 47-51.*  Further, they have no evidence of any person recently victimized of any crime committed by Duggins, and no evidence that Duggins has ever spoken to anybody on the phone about criminal activity. In lieu of such problematic and strongly inculpating information, all they have is mere hearsay evidence which bears no indicia of reliability, as it is coming from a murderer, whom by his own

admission was the mastermind who planned and executed the murder (without Duggins' help). *Id. at pages 49-50.*

Furthermore, and by the way, if the government believes that it has additional evidence within its' arsenal, besides the word of a person capable of murdering a member of his own supposed family – perhaps more of the same, (i.e., other bandits within the gang with similar instincts or capabilities), then an *ex parte* submission of that evidence would be an improper methodology to determine the Defendant's dangerousness in the context of a due process violation.[11]  Judge Rehnquist backs up the Defendant's point poignantly when he states:

> "[before a person can be detained] the government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, but that is not enough. ***In a full-blown adversary hearing,*** the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community. . . and with [a]ll the ***due process*** safeguards . . . [including the right] to cross examine witnesses who appear at the hearing are statutorily guaranteed to the arrestee."

United States v. Salerno, 481 U.S. 739, 748-751 (1987);

The point here is that there is more evidence then some taped recording by PERVERSO, who upon review of the same appears deranged, then let this Court make findings on that evidence in an open evidentiary hearing, and not behind closed doors and where this evidence cannot be tested.

***Mr. Duggins' behavior since his withdrawal appears conforming, and as such rebuts the government's theory that the Defendant is still a member of MS-13.***

Furthermore, and to rebut PERVERSO's baseless claim, the Defendant has provided specific evidence of a present lifestyle which would challenge him being the leader of any clique.

---

[11] This is a mere preemptive attempt to make sure the government's response to this motion is not "sealed" with evidence that nobody can see but the Court and the government – thereby denying the Defendant any opportunity to rebut it.

During the time that Mr. Duggins was the purported leader of MS-13, he worked more hours than that of the average person in society.  Also, this supposed leader also chose to pay his income taxes to the federal government[12] – an almost unheard of proposition.  Furthermore, the Defendant lived in a stable home environment, and had three young kids that he provided care for on a daily basis.  Mr. Duggins also has a fourth child that he would see every weekend, and as a result said child would be an extended addition of his nuclear family.   Moreover, the Defendant has never been seen once with any of his co-conspirators[13] – most likely because he a job and a productive life.   Lastly, the Defendant successfully completed his most recent three year probationary period without one violation, and in fact, he got his probationary period terminated early – short of the requisite three years, due to good behavior.

All of the above aforementioned factors, and the last one in particular, provides strong evidence to this Court which cuts against the government's quantum of proof on the Defendant being a clear and present danger to society. He believes that as a result, the intital <u>Zannino</u> factors, which appear to favor the Defendant, lend support to a finding a due process violation.

**b.  The length of the Defendant's detention.**

The length of Duggins' pre-trial detention is another factor for this Court to consider, and the Defendant claims that the length of his detention is substantial.  Mr. Duggins has been detained more than 16 months, and with no trial date on the horizon.  By the way things are going presently, 2021 could very well be the year before Mr. Duggins can finally exercise his constitutional right to a jury trial, and we haven't yet reached halfway through 2020.  The length of the detention is critical due to the "crucial liberty interest at stake."  <u>United States v. Suppa</u>,

---

[12]  *See testimony of C. Valladares, Dkt. #86 at page 72.*

[13]  *Id. at page 40-41.*

799 F. 2d 115, 120 (3rd Cir. 1986); See also United States v. Perry, 788 F. 2d 100, 114 (3rd Cir.) ("the grave invasion of the most fundamental of all personal liberties that occurs when preventive detention is ordered"). Other courts faced with a lengthy detention have found a due process violation. United States v. Daniels, 2000 WL 1611124 (2000) (Neiman, J.) (23 months); United States v. Gonzalez Claudio, 806 F. 2d 334, 343 (2d. Cir. `1986) (14 months); United States v. Chen, 820 F. Supp. 1205, 1210 (1992) (12 months); United States v. Melendez-Carrion, 790 F. 2d 984, 1008 (2nd Cir. 1986 (8 months); See also Theron, 782 F. 2d at 1516-17 (4 months).

### c. Complexity of the case and whether the strategy of one side or the other has needlessly added to it.

Duggins contends that although this case has been deemed as complex, when one considers the factual particulars, not so much. This case arises out of a murder, allegedly committed by five members of MS-13, with the sixth (Duggins) excluded as a suspect. *See Duggins' indictment generally.* There have been thousands of pages of "historical" discovery, provided by the government to advance their claim that MS-13 is an "enterprise" affecting interstate commerce within the relevant statute.[14] This is not what makes this case complex, but rather only really making it more involved, as the Defendant does not anticipate challenging whether MS-13 is an actual "enterprise" for purposes of a RICO prosecution – only whether as of last five years preceding the indictment, did he agree to participate with the group in their execution of racketeering acts. This case in essence can be distilled down to two issues: a) whether the Defendant can affirmatively prove that he withdrew from the enterprise five years before the indictment came down, and b) whether the Government can prove that the defendant

---

[14] See United States Marino, 277 F. 3d 11, 33 (1st Cir. 2002) (Five elements must coalesce to make out a RICO violation: (1) an enterprise existed; (2) the enterprise participated in interstate commerce; (3) the Defendant was employed by or was associated with the enterprise . . .").

rejoined the enterprise (or never withdrew). Most of the evidence (with the exception of the Perverso calls) which the government has provided to date does not address either evidentiary challenge.

Furthermore, and over the last 16 months, it was the government who had to move through their various protocols, submitting the case to Capital Case Review – which does not involve Duggins. However, and because he is joined at the hip to his co-defendants but without any ruling on a severance, he has to sit in the back-seat and wait until he can get out of the car to gain access to his final destination. Maybe the government has a different view point about all of this but what the government cannot argue is that Duggins' 16 month delay between arraignment and trial cannot be attributed to any action or inaction on the part of Duggins. In fact, everything Mr. Duggins has done, from filing a motion to sever his case, to objecting to any more status conferences (unsuccessfully he might add) has been to move this case to verdict. See Theron, supra, (defendant indicted with 11 others, and moved for severance (which was denied), and after 4 additional months of pretrial detention, Court ordered him released on conditions or tried within 30 days).

## SUMMARY AND PROPOSED CONDITIONS

In United States v. Gatto, 750 F. Supp. 664, (1990) a District Court judge reconsidered orders of detention, for defendants Gatto (and others) after they were charged with a RICO conspiracy and several other federal offenses – all of which surrounded an illegal numbers gambling business which used violence to eliminate competition, to establish a climate of fear, and to obstruct law enforcement. Id at 666. However, and after delays of between 15 to 21 months for these defendants, the District Court ordered the release of these defendants, who it believed posed a danger but who also had been detained for too long. Id at 674, 676. In United

15

States v. Gonzalez Claudio, 806 F. 2s 334, (1986) the 2nd Circuit Court of the appeals released particular defendants, charged with being flight risks, and who were alleged to have been involved in a raid where United States sailors were killed.  As a rationale, the Court said the following:

> "The Due Process Clause endeavors to set outer limits at which risks to society must be accepted to avoid unconscionable deprivation of the liberty of individuals."

Id at 343.

Here Mr. Duggins is not charged with killing anyone.  The ***undocumented*** evidence against him -- that presently he is a RICO conspirator, flies in the face of his ***documented*** behavior.  In Gonzales Claudio, the detention orders of the District Court were vacated by the 2nd Circuit Court of Appeals, and the case was remanded for the prompt setting of reasonable conditions of release in accordance with 18 U.S.C. sec. 3142(c). Id at 343. The Defendant seeks the same remedy here – first, a response from the government, second, oral argument if need be, and third, (and only if the Court finds a due process violation) convene an immediate hearing for the setting of reasonable conditions of release, which could include:

1) Electronic Monitoring;

2) Release to the custody of his mother;

3) Surrender of Passport

4) Resume work with previous employer;

5) Curfew or home confinement when not at work

6) Reporting to pre-trial services as the Court directs

7) No contact with any known felons, with the exception of family

8) No contact with any of the co-defendants or any known witnesses to the case

Mr. Duggins would agree to these as well as any other conditions that the Court would care to

impose.  Under these strict conditions, the risk of flight or danger is negligible.  Again, if the Government seeks to make outlandish claims that the Defendant has recently or actively engaged in conduct which can be construed as threatening, he would seek an evidentiary hearing on that issue to determine the same.

    Mr. Duggins pray for relief.

|  |  |
|---|---|
|  | Respectfully Submitted,<br>DJAVIER DUGGINS<br>By his Attorney,<br><br>/s/ Gordon W. Spencer<br>Gordon W. Spencer, Esq.<br>BBO #630488<br>945 Concord Street<br>Framingham, MA 01701 |
| April 7, 2020 | (508) 231-4822 |

**CERTIFICATE OF SERVICE**

  I, Gordon W. Spencer, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on April 7th, 2020.

               /s/ Gordon W. Spencer