# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | Case No. 18-cr-10450 |
| **DJAVIER DUGGINS** | |

## MOTION IN LIMINE TO PRECLUDE HEARSAY TESTIMONY OF ALLEGED CO-CONSPIRATORS MADE TO GOVERNMENT AGENTS, WITH NO AVAILABLE HEARSAY EXCEPTION UNDER F.R.E. 801(d)(2)(E)

**Introduction:**

NOW COMES the Defendant, Mr. Djavier Duggins, ("Duggins") and respectfully moves to exclude all hearsay testimony from co-defendant Salvador Gutierrez ("Gutierrez") made to a government agent – hereafter named "CW-13".  He also moves to exclude all hearsay testimony from co-defendant Erick Lopez ("Lopez") made to two other government cooperators – "CW-1" and "CW-17".

With respect to Mr. Gutierrez's statements, there are two reasons for Duggins' requested exclusion.  First, Gutierrez's statements not only would amount to "testimonial" communication, and thus be barred under the Sixth Amendment to the United States Constitution, but second, the statements were not made in furtherance of any conspiracy and therefore has no available hearsay exception to admit them.   With respect to Mr. Lopez's statements, Duggins does not argue that his statements were "testimonial" communications, but only that his statements (just like Mr. Gutierrez's) were not made in furtherance of any alleged conspiracy.  This motion will primarily deal with the statements made from Gutierrez, where they have been the "hot-button"

topic in most of the litigation thus far.  Once Duggins' arguments in favor of exclusion are made with respect to Mr. Gutierrez's statements, Duggins will thereafter demonstrate how Lopez's statements can also rely upon similar arguments, but only in the context of whether they were made in furtherance.

Starting with Mr. Gutierrez's statements, and regarding Duggins' first contention about them, he argues that under *Crawford v. Washington,* 541 U.S. 36 (2004), and *Davis v. Washington*, 547 U.S. 813 (2006), his statements come from the product of interrogation by law enforcement (and/or its' agents) which had a primary purpose to establish or prove past events potentially relevant to a later criminal prosecution, and thus would be "testimonial" and therefore inadmissible, unless an opportunity is given to Duggins to cross-examine them.   If this Court feels different, that the statements do not qualify as testimonial, Duggins contends that they still were not made to the government agent "in-furtherance" of any alleged conspiracy between Mr. Duggins' and Mr. Gutierrez, and thus would still be hearsay with no available exception to the hearsay rule.   To reach one conclusion over the other, a review of the factual circumstances regarding the specific statements would be necessary.

**A.  First, the indictment.**

On November 28, 2018, Duggins was indicted on one count of conspiracy to conduct enterprise affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (d). *See Dkt. entry # 83* – FIRST SUPERSEDING INDICTMENT.  The enterprise is named "La Mara Salvatrucha", also known as the MS-13 criminal organization, alleged to be composed of immigrants or descendants of immigrants from Central America, but has allegedly taken up roots here in the Commonwealth of Massachusetts.  *Id.*  The purposes of the alleged enterprise are as follows:

(a)     Promoting and enhancing the prestige, reputation and position of the enterprise **with respect to rival criminal organizations**; (emphasis added).

(b)     Preserving and protecting the power, territory, and criminal ventures of the enterprise through the use of intimidation, threats of violence, and acts of violence, including murder, attempted murder, and assault;

(c)     Keeping victims, potential victims, and community members in fear of the enterprise and its members and associates; and

(d)     Ensuring discipline within the enterprise and compliance with the enterprise's rules by members and associations through threats of violence and acts of violence.

*Id. at paragraph* 8.

Duggins submits that, and from review of the above, it would appear that the alleged enterprise's primary goals and/or objectives amount really to just pure **"violence"**, in order to effectuate:

i)     The proliferation of prestige and power (via the **violence** they inflict upon each other and rival gangs, and the fear that they create within their respective communities); and

ii)     Discipline and respect amongst its' members (again via **violence**).

**B.  Second, Mr. Salvador Guiterrez and CW-13.**

Starting from the premise of the indictment, in comes Mr. Salvador Gutierrez, a person who was alleged to have been a member of MS-13, and alleged to have been carrying out gang affairs via the "Sykos" clique, an alleged local chapter of the organization.  *See Dkt # 83 generally.*  In October of 2018, Gutierrez was in custody at the Billerica House of Corrections. During this month, a person ("CW-13") was also a resident there and who was also was under the thumbnail of the government, after he was indicted for his involvement in the MS-13 alleged criminal enterprise, and thereafter CW-13 entered into plea and cooperation agreement with the

government.[1]  Gutierrez heard about the possibility of CW-13's agreement – in essence that CW-13 was a MS-13 operative turned government informant, and once he heard that CW-13 was at the facility, he sought out CW-13 to speak with him in order to challenge that rumor.[2]   As an aside, approaching CW-13 with such a claim would be a dangerous practice for Gutierrez, as MS-13 gang rules state that if one member of MS-13 falsely accuses another of being cooperator that would be a crime worthy of death.[3]

During the initial meeting between the two gentlemen, CW-13 denied to Gutierrez that he was a cooperator, which must (of course) have sent the message to Gutierrez that he may have violated gang-rules with the aforementioned life-threatening penalty as described above.[4] Gutierrez then proceeds (as alleged by CW-13) to make verbal (and unrecorded) statements to CW-13 which are incriminating in nature, giving factual accounts regarding himself, as well as other people claimed to be members of the Sykos clique (including Duggins).  *See exhibit 3.* After CW-13 took notes of all the information provided by Gutierrez (presumably outside of Gutierrez's presence) he then takes his work-product back to the government, who then sends him back to Gutierrez, specifically to "do it again", but this time under government supervision, and under government memorialization, so that a record could be made of the statements, and

---

[1] *See* the plea agreement between the government and CW-13, *filed under seal as exhibit 1*, wherein CW-13 was indicted and plead guilty in the federal court for various offenses.  See also CW-13's cooperation agreement, *filed under seal as exhibit 2*.

[2] See the interview proffer of CW-13, *filed under seal as exhibit 3*.

[3] *See* the testimony of S.A.  Jeffrey Wood*, filed under seal as exhibit 4.*

[4] See *exhibit 3.*  The interview proffer does not mention any belief by Gutierrez that he may have violated gang-rules by accusing CW-13 of being a cooperator, just only that he denied to Gutierrez that he was one.  Duggins take some liberty with a little inference-drawing here, as it is reasonable to believe that Gutierrez was aware of the specific rules that apply to his specific gang.

presumably for later criminal prosecution.[5]   CW-13 was successful in his efforts as Gutierrez decided to dance with CW-13 one more time, but with this second time around the government gets a parting gift – a recording to take home – and one which the government will surely attempt to parade in front of a jury – suggesting the recording was created for that purpose.

As far as the reasons why Gutierrez decided to give a re-run of his initial conversation with CW-13 can only be left to speculation.  However, what is not up for conjecture is the fact that by Gutierrez telling Sykos Clique business to CW-13, even once, would also be a violation of gang rules.  This is because Duggins has learned via discovery received from the government that it is also a gang-promulgated rule of MS-13 that its' members are not to discuss clique business with other cliques.[6]

During this second interview conducted by CW-13 (or "interrogation" as Duggins sees it), CW-13 proceeds to examine Gutierrez, posing to him questions which CW-13 already knows the answers – in particular the factual circumstances surrounding the death of one Herson Rivas – a Sykos Clique member who was killed by his fellow clique members (including Gutierrez) based upon their belief that he was cooperating with law enforcement. *See exhibit 5*.  While the bulk of their discussions seemed to focus upon this killing,  it cannot be ignored that Gutierrez also sprinkles Duggins' name around within the conversation, including allegations that he was the leader of the clique, and that (after the killing of Rivas) he checked the area for security cameras, which frankly seems a bit late in the game.  *Id.*  Again, no one knows the reasons for why Gutierrez decides to re-count his life-story (short as it was) with MS-13, and with the Sykos

---

[5] See *exhibit 3 and now exhibit 5* – the transcript of the recorded conversation between CW-13 and Gutierrez.

[6] See testimony of S.A. Jeff Wood, filed under seal as *exhibit 6*.  The reason why Gutierrez broke this rule is also anybody's guess.  Perhaps he was in fear of being "green-lighted" for accusing CW-13 of being an informant – unless of course the government has a better idea for why Gutierrez would break "conspiratorial rules".  Whether it was due to fear, or some other speculative reason, at any rate, it would defy logic that Gutierrez would break "conspiratorial rules" in order to further the conspiracy he was alleged to be a part of – thereby casting doubt on any theory that his statements to CW-13 were in furtherance of conspiratorial objectives.

Clique chapters in particular, but in any event, Duggins contends that Gutierriez's autobiographical account of his experiences with the clique reveals no intent by this young man (or even any expectation by him) to proffer his words in furtherance of the aforementioned stated MS-13 goals of **"violence"** upon: a) rival gang members; b) the community at large; and/or c) each other.

In essence, Mr. Gutierrez's statements to CW-13, taken in its' total context, appears to amount to nothing more than a casual conversation, consisting of "idle chatter", and "gossip" much akin to what two people do anytime they are part of the same company but in different departments – let's say one being in accounting, and the other in marketing.[7]   Mr. Salvador Gutierrez's statements, but only the ones which mentions Mr. Djavier Duggins, are provided below as follows:

**Statement #1[8]**

   PERVERSO:   And you, how old were you when you were jumped in?

---

[7] This analogy can actually be developed further.  Imagine a situation where 2 co-workers are comparing notes at the water-cooler about who is excelling within the company, or who is deficient – as being one scenario, and then another scenario where a staff meeting is taking place which includes them both, but where the staff meeting's agenda is to advance the goals of their specific company.  Duggins' contends that any statements made during the staff meeting would be statements in furtherance of the conspiracy (company), but the statements made at the water-cooler would not, amounting to idle chatter about each other's experiences while employed for the company. This would not be the case (of course) if the chatter at the water-cooler would somehow further the company's goals (i.e., where they talked about working together to propose a new marketing or accounting plan to the higher-ups). Bringing the analysis back to the present case, the conversation between Salvador Gutierrez and CW-13 was akin to that of two people from different departments speaking at the water-cooler about past events.  Here the government cannot demonstrate by a preponderance of the evidence that their conversation was intended by Gutierrez to further the goals of the conspiracy.

[8] See pages 4 and 8 of *exhibit 5*. This first passage starts off with Gutierrez (a/k/a "Pervoso") and CW-13 comparing notes on when they both were admitted ("jumped") into the gang.  Pervoso then explains that he joined the gang at the age of 16, but then at some point the conversation suggests how Haze ("Duggins") asked him to join the Sykos Clique.  So as to appreciate the point early, Duggins submits that the government cannot prove by a preponderance of the evidence that Gutierrez's "narrative declarations", explaining the historical account of when he joined MS-13, and/or the circumstances behind how he joined the Sykos Clique would further the conspiratorial objectives of "violence" involving: a) rival gangs; b) the community; or c) each other. See *United States v. Doerr*, 886 F. 2d 944 (7th Cir. 1989) (narrative declarations, mere idle chatter, and superfluous casual conversations are not statements in furtherance of a conspiracy).

PERVERSO:        About 16?

CW-13:           16?

PERVERSO:        Yes, and you?

CW-13:           About 17, I think something like that

PERVERSO:        I was almost 17, dog. . . .

PERVERSO:        [Duggins] was getting out right about that time, dude, and Vago and SHADOW.  I met them and they asked me, what's up, what did I think dude?  I told them I would think about it, and a few days later, dude [Duggins] called me. "What's going on?  What did you decide?"  Yes, dude." So I was with them a good while ago. Afterwards, I beat up a son of a bitch over by Pollo Cambero, and I stabbed him two times dog, and he said to me, "Dude we're making you chequeo.  I've also heard some things about you".

PERVERSO:        Yes, DELICUENTE was running it.  When [Duggins] got out dude, [he] asked DELICUENTE if he had jumped –in any dudes to be homeboys or stuff like that, of if he had boys.

**Statement #2[9]**

CW-13:           But who has First Word, HAZE or MAYUMBU or SHADOW?

PERVERSO:        [Duggins].

CW-13:           Why did MAYIMBU get Second Word?

PERVERSO:        Because DELINCUETE gave it to him.  DELINCUETE had Second and DELINCUENTE gave it to him, dude.

CW-13:           Why didn't SHADOW get it?

PERVERSO:        Because SHADOW, fuck, he has a lot of kids. He has like twin girls, and he has a son, about two years old.  He has about four Children just with the woman he's with now.  And with CABALLO'S woman he has a daughter, I think.

---

[9] *See exhibit* 5 at p. 14. This exchange merely deals with CW-13 asking Gutierrez who is the present leader of the clique, and Gutierrez stating it was Duggins, who received the title from perhaps a person (Deliccuente) who was acting as first word while Duggins was in jail.  It should be emphasized that CW-13 already knew the answer to the question (*see exhibit 3*) but was sent back to Gutierrez by the government to get it on tape.

**Statement #3**[10]

| | |
|---|---|
| CW-13: | So, and the boy that you guys killed at the park in Lynn, why did you kill him? |
| PERVERSO: | Because the guy was working with the cops dog. |
| CW-13: | And who figured that out. |
| PERVERSO: | That guy, he has a thing, give him a beating or kill him.  And through [Duggins], I had noticed what the guy's password was.[11] |

**Statement #4**[12]

| | |
|---|---|
| CW-13: | Were there cameras there?  Did you check? |
| PERVERSO: | At the entrance to the park, there's a fence and there is a sign that has a photo of a camera.  There's a photo of a camera, like saying that the park is protected with cameras.  Afterwards, I started to think about that. Later, [Duggins] went to look and the dude didn't see cameras in the park. |

**Statement #5**[13]

| | |
|---|---|
| PERVERSO: | MAYIMBU'S girl is in jail. |
| CW-13: | Why? |
| PERVERSO: | Because she was driving with a bad license.  When UI was around, she wasn't in jail. |
| CW-13: | But she didn't see the boy. Only if he UI and told her, to impress her. |
| PERVERSO: | ROCA told her, doggie. |

---

[10] *See exhibit 5* at p. 16.  Duggins emphasizes the interrogation style of CW-13.  Duggins likens it to a prosecutor, conducting a direct examination of a witness for the jury.

[11] Duggins contends that this information contained within this exchange is not entirely accurate.  Duggins is a fluent Spanish speaker and has reviewed the Spanish audio recording, and opines that his name was never mentioned during this passage. He demonstrates this by way of affidavit, attached hereto as *exhibit 7*.  In actuality what he believes was mentioned in this passage was that Gutierrez was drinking and smoking at a hotel, whereupon he was able to discover Mr. Rivas' password.  The undersigned intends to confer with the government to see if the parties cannot reach a consensus about the true nature of the conversation.

[12] See *exhibit 5* at p. 24.

[13] See *exhibit 5* at p. 33-34.

| | |
|---|---|
| CW-13: | To show off? |
| PERVERSO: | The girl went to see him and she sked him what we were going for. She had seen him. |
| CW-13: | No. |
| PERVERSO: | I heard that the girl was telling him, I heard she told him, I regret having killed with that dude. |
| CW-13: | With whom? |
| PERVERSO: | With MAYIMBU. Without UI that girl there |
| CW-13: | UI the fuck up, dude. |
| PERVERSO: | How could he trust that girl, those two girls doogie, that dude. [Duggins] always told me, "Look when you go kill a son of a bitch, dude, invite any other dude except MAYIMBU, dude. I wouldn't go kill someone with MAYIMBU, he told me, "even if they paid me!"  The problem with MAYIMBU is that he has a big mouth.  When he's drunk, he likes to talk about stuff to show off to the girls.  One time, the girl that was coming, the girl that's would bring her son, that girl wanted to introduce those guys, the girl that's would bring her son, that girl wanted to introduce those guys, because she knew he was a son of a bitch, dude.  The guys respected that girl because she was very quiet.  She likes those conversations UI.  She brought her sister, she brought her sister and two more girls, and two more girls. So MAYIMBU was showing off stuff, dude, for the girls to see.  He was a fucker.  He would pull out his wallet, dude, he was drunk.[14] |

---

[14] Duggins also asks the Court to take particular note of this conversation.  This passage, when taken in its proper context, appears that Gutierrez is expressing displeasure with fellow gang member "MAYIMBU" – who is actually Erick Lopez.   One can only conclude that Gutierrez is "gossiping" about him, and in a disparaging way, saying how he has a big mouth, and likes to show off to girls.  Gutierrez then uses this gossip as a platform for exclaiming he regretted "kill[ing] with that dude".  In looking for back-up support for his regrets, he uses a statement, allegedly made by Duggins, who according to Gutierrez apparently agrees with the gossip. Again, Duggins fails to see how this passage was "made" in furtherance of the conspiracy.  At best, the statement spoke about clique business, gossip even, where one member appears to be "excelling" (Gutierrez) and the other appears to be "deficient" (MAYIMBU).  Also there appears to be an alleged third member (Duggins) who is only used as corroboration for the gossip.

# I.

## THE STATEMENTS GIVEN BY SALVADOR GUTIERREZ WERE "TESTIMONIAL" AND THEREFORE BARRED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION

### INTRODUCTION

> **"[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law [of 1791] required: unavailability and a prior opportunity for for cross-examination."**

*Crawford v. Washington,* 541 U.S. 36, 68 (2004).

In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court undertook and imposed a blueprint for analyzing whether the introduction of hearsay evidence offends the Confrontation Clause of the Sixth Amendment, with just two elements: 1) the declarant must be unavailable; and 2) the hearsay statement must exhibit sufficient "indicia of reliability". *Id.* at 66.   Reliability could be proven by showing that the statement falls within a "firmly rooted hearsay exception" or has "particularized guarantees of trustworthiness". *Id.*   However, and almost 25 years later, the Supreme Court overruled *Roberts* in *Crawford,* 541 U.S. at 60 (Justice Scalia opining that the *Roberts* test departs from the historical meaning of the Confrontation Clause and therefore "fails to protect against paradigmatic confrontation violations").  *See also Davis v. Washington* 547 U.S. 813, n.4 (2006) ("*Roberts* condition[ed] the admissibility of all hearsay evidence on whether it falls under a `firmly rooted hearsay exception' or bears `particularized guarantees of trustworthiness.'" *Crawford,* 541 U. S., at 60 (quoting *Roberts,* 448 U.S. at 66). We overruled *Roberts* in *Crawford* by restoring the unavailability and cross-examination requirements.).

In overruling *Roberts*, Justice Scalia took a modern-day view on the historical machinations of the Confrontation Clause, and thereby drawing two inferences from its' history to determine the doctrine's true goal and application:  First, the Confrontation Clause serves to

10

prevent the "evil" of *ex parte* examination as evidence against the accused; and 2) the framers would have rejected the admission of "testimonial" statements unless the declarant was unavailable for trial and the defendant had a previous opportunity for cross examination. *Crawford,* 541 U.S. at 59.  The simplicity of this doctrine can apply to our case here rather seamlessly.  Duggins submits that if Mr. Gutierrez's statements were considered to be some sort of "testimonial" evidence against Duggins – where Duggins is deprived of the right of cross-examination, due to Gutierrez being unavailable for trial, Mr. Gutierrez's statements would be barred under the Sixth Amendment.

Thus, and moving forward, the only operative issue to address in answering whether Gutierrez's statements should be barred would be to determine whether his statements amount to "testimony".  Once that question is answered (and Duggins believes it would be in the affirmative) the only holdup would be whether the statements "if", were also deemed non-testimonial, because they were made in furtherance of any conspiracy, would somehow still be admissible under F.R.E. 801(d)(2)(E), the co-conspirator exception to the hearsay rule.  Or in other words, would the Federal Rules of Evidence, which were codified in 1975, and allows the admission of certain hearsay evidence, somehow trump the United States Constitution, a much more magnanimous and dated set of rules, and one article in particular, which bars the same hearsay evidence.  Of course, we know that the Federal Rules of Evidence don;t have that much star-power.  *See Crawford* at 51 ("[l]eaving the regulation of out-of-court statements to the law of evidence" renders the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.").   To get to the bottom of this brainteaser, all it requires is an understanding of how our Courts have defined "testimony" in the context of the Sixth Amendment, and Duggins will start there.

**A. Definition of testimonial evidence.**

The Supreme Court has not provided a precise definition of what statements count as "testimonial." *See Ohio v. Clark,* 135 S. Ct. 2173, 2179 (2015); *Crawford* 541 U.S. at 68; *United States v. Rodriguez-Marrero,* 390 F.3d 1, 16 (1st Cir. 2004). Instead, it has directed lower courts to determine whether the statement has "[the] primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," *see Davis* 547 U.S. at 822, or falls within a "core class of testimonial statements," *Crawford* 541 U.S. at 51-52. Although the *Crawford* court left "for another day any effort to spell out a comprehensive definition of testimonial", the Court did provide some clues. It set forth 3 possibilities: (1) *ex parte* in-court testimony or its functional equivalent that declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in formalized testimonial materials; (3) statements made upon circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id.* In addition, the Court did also note that testimonial statements also includes "police interrogations".[15]

Then, approximately 2 years later, in *Davis v. Washington*, 547 U.S. 813 (2006), the Court gave further insight into the definition of testimonial evidence when it stated the following: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable

---

[15] Justice Scalia explains why police interrogations are also testimonial. He likens them to a "striking resemblance to examinations by justices of the peace in England". *Id.* at 52. He speaks of unsworn confessions to police as being no different than a sworn confession in terms of testimonial evidence. *Id. at* n 3. (we find it implausible that a provision which concededly condemned trial by sworn affidavit also thought that trial by unsworn affidavit perfectly OK). Justice Scalia goes back to the 1700's as support for his opinions, which he also endorses that "such unsworn confessions [however] were not admissible against anyone but the confessor". See 2 W. Hawkins, Pleas of the Crown, ch. 46, § 3, pp. 603-604 (T. Leach 6th ed. 1787);

police assistance to meet an ongoing emergency.  *Id.* at 822.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.  *Id.*

Duggins believes that Salvador Gutierrez was subjected to interrogation when he was approached by an agent of the government (CW-13), and whereupon Gutierrez was examined by this government agent regarding his life-story, in an almost interviewed styled approach, but where the examiner was merely doing a re-write, so that his employer (the FBI) could have the evidence it needed for trial.   The government may counter this last point by claiming that there was no "police interrogation" which took place between CW-13 and Salvador Gutierrez, and so therefore it cannot meet the definition stated in *Crawford*.   With these two conflicting positions, the question is thus begged, what exactly is interrogation?

**B. Definition of interrogation.**

In *Rhode Island v. Innis,* 446 U.S. 291, 302 (1980), the Supreme Court gave the definition of "interrogation", by stating:

> "The definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."

This definition provides the basis for the arguments to follow.   As a general matter, and based upon the *Innis* definition of interrogation, if an actual police officer were to have approached Gutierrez and engaged him in the same questioning as did CW-13, they *should have known* that their questioning was likely to elicit an incriminating response.  Furthermore, and based upon the *Davis* definition of testimonial, if the interrogation was implemented to establish or prove past events, the responses would be just that.  *Id*  at 822.  Appreciating these two points, the only

question which remains is whether anything changes with respect to the "testimonial" status of the Gutierrez statements where they were not elicited by law enforcement, but rather by an informant working at the behest of them?  If nothing changes, then Guiterrez's statements would as well, in that context of interrogation, be testimonial.[16]

### C. Are confidential informants in the same shoes as government agents, when they engage in the examination of suspects to elicit incriminating responses – on the behalf of the government?

Duggins submits that when informants work for law enforcement, there is an "agency" relationship which exists between them.   An agency relationship is the "fiduciary relation which results from the manifestation of consent by one person to another shall act on his behalf and subject to his control, and consent by the other so to act".  Restatement (Second) of Agency, § 1 (1958).  The courts have looked primarily at the issue of control in determining whether an agency relationship exists. *North American Van Lines, Inc. v. NLRB,* 869 F.2d 596, 599 (D.C.Cir.1989) (right to control means and manner of performance the central inquiry in determining agency status for purposes of defining NLRB jurisdiction); *Afonso v. City of Boston,* 587 F. Supp. 1342, 1347 (D. Mass. 1984) (liability to direction and control the essential element in existence of master-servant relationship).  Payment for services is relevant only to the extent that it bears on the issue of control.  *Afonso,* 587 F. Supp. at 1347.  Similarly, consent to control and to act in a fiduciary manner is important to a finding of an agency relationship.  *Abatti v. C.I.R.,* 644 F.2d 1385, 1390 (9th Cir.1981) *United States v. Summers,* 598 F.2d 450, 459 (5th Cir.1979) (excluding taped statements of defendant's former agent on grounds that he could not be agent of defendant and informant for FBI at same time).  Based upon the aforementioned, we

---

[16] If the government intends to qualify the family of interrogators to only uniformed police officers, Duggins refers the government once again to *Crawford*, at n.4 (We use the term "interrogation" in its colloquial, rather than any technical legal, sense. Cf. *Rhode Island* v. *Innis,* 446 U. S. 291, 300-301 (1980). Just as various definitions of "testimonial" exist, one can imagine various definitions of "interrogation".)

have the tools to answer the question of whether CW-13 was acting as a government agent in this instance when he conducted what appeared to be a structured interrogation of Mr. Gutierriez – as he was sent to question him by the government.

    **1. CW-13 was sent by the government to question Gutierrez.**

Duggins merely asks the Court to review the interview proffer of CW-13 (*exhibit 3*), wherein he first outlines what he knows about Gutierrez and Duggins, and then sent back to Gutierrez by the government to make a record of it.  As such, "[A]n informant becomes a government agent . . . when the informant has been instructed by the police to get information about the particular defendant". *United States v. Birbal*, 113 F. 3d 342, 346 (2nd Cir. 1997) (where government informant only sought to provide general information about crimes, and not with respect to any defendant in specific no constitutional violation of right to counsel under *Kuhlmann v. Wilson*, 477 U.S. 436 (1986)).   In *Kuhlmann,* the Court held that where a prisoner makes incriminating statements to a passive listener—a "listening post"—the introduction of the prisoner's statements does not violate his right to counsel because the informant's presence does not constitute an interrogation.  477 U.S. at 459, 106 S.Ct. at 2629.   However, the *Kuhlmann* Court did recognize its' holding in *Maine v. Moulton*, 474 U. S. 159 (1985):

> "Significantly. . . because of the relationship between the defendant and the informant, the informant's engaging the defendant "in active conversation about their upcoming trial was certain to elicit" incriminating statements from the defendant. *Id.,* at 177, n. 13. Thus, the informant's participation "in this conversation was `the functional equivalent of interrogation.' " *Ibid.* (quoting *United States v. Henry, 447 U. S., at 277 (POWELL, J., concurring)).*"

*Kuhlmann,* at 458.  *See also Stano v. Butterworth*, 51 F. 3d 942, 977 (11th Cir. 1995) (citing *Kuhlmann*, 477 U.S. at 459) (primary concern of *Massiah* line of decisions are secret interrogation techniques equivalent to direct police interrogation).

A wealth of other circuits agree that an informant becomes a government agent for purposes of *Kuhlmann* but only when the informant has been instructed by the police to get information about the particular defendant.  *See e.g., United States v. D.F.,* 63 F. 3d, 671, 682 n. 16 (7th Cir. 1995) (key inquiry is whether "the government directed the interrogator toward the defendant in order to obtain incriminating information"; *Robinson v. Clarke*, 939 F.2d 573, 576 (8th Cir. 1991) (where government had not asked informant to solicit information while in prison, no Sixth Amendment violation); *United States v. Watson*, 894 F. 2d 1345, 1347,48 (D.C. Cir. 1990) (government informant was not instructed to obtain information from defendant, entrepreneurial acts did not violate defendant's Sixth Amendment rights); *Brooks v. Kincheloe*, 848 F. 2d 940, 945 (9th Cir. 1988) (even though informant solicited information from defendant before going to the police, informant had not been asked to obtain information from defendant). *See, also e.g., Marin v. United States,* 814 F.Supp. 1468, 1485 (E.D.Wash. 1992) (finding a special relationship between INS agents and a detainee whom they released from custody to act as an informant).  *See also United States v. LaBare*, 191 F.3d 60, 64 (1st Cir. 1999) ("*Massiah* applies only to interrogation by the government or someone acting on its behalf") (citation omitted).[17]

When one considers the above, there can be no dispute that CW-13 was acting as an agent of the government under *Kuhlmann* and was obviously a secret interrogation, via

---

[17] Agency relationships also appear in the context between private citizens and government agents.  *See United States v. Pervaz*, 118 F. 3d 1, 6 (1st Cir. 1997) (identifying three factors as potentially relevant in deciding whether a private party acts as a government agent in the context of the 4th Amendment: "the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests.").

investigatory techniques that are the equivalent of direct police interrogation.[18]   On October 24, 2018, CW-13 was specifically sent by law enforcement to create a record of what he claimed was previously told to him by Gutierrez.  Duggins submits that not only was the CW-13 acting primarily to help the government, but all the while serving his own interests, by its promises to the CW-13 of quite measured and helpful benefits.[19]   Furthermore, CW-13, while in the shoes of law enforcement, engaged in an "interrogation" of Gutierrez, as defined by *Innis*, as he was asking questions designed to elicit incriminating responses.  Under this definition, Duggins sees no substantive difference between law enforcement eliciting incriminating responses, or one of its agents.

   **2.  Since CW-13 (as an agent of law enforcement) engaged in an interrogation of Gutierrez, which was designed or procured to create a record for trial, was it therefore testimonial?**

   Based upon the above, and where: a) as defined by *Innis*, interrogation involves questioning (from law enforcement) which elicits an incriminating response; b) CW-13 stands in the shoes of law enforcement via his agency relationship with them; and c) where CW-13 was sent specifically to Gutierrez to obtain incriminating statements from him, so to create a record for prosecution, then Duggins submits that the Gutierrez statements cannot be considered as anything but "testimonial", and thus barred under the Confrontation Clause .  *Michigan v. Bryant*, 562 U.S. 344, 358 131 S.Ct. (2011) (To determine if a statement is testimonial, we must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony."); *see also Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2720 (2011) ("When the

---

[18] If the government disputes the agency relationship between CW-13 and the FBI, Duggins seeks an evidentiary hearing, but only after the Government establishes via affidavit, that the elements of agency have not been met.

[19] The benefits which have been conferred upon CW-13 were "good and plenty", as can be seen in *exhibit* 2.

primary purpose of a statement is not to create a record for trial, the admissibility of the

statement is the concern of state and federal rules of evidence, not the Confrontation Clause."

(internal quotations and citations omitted)).

### 3. Would the fact that Mr. Gutierrez's statements were made in furtherance of a conspiracy, somehow negate the analysis above, and thus "un-bar" the testimonial statements?  Duggins doesn't think so.

The government will surely resist any notion that the Gutierrez statements were

testimonial.  They may attempt to attack whether the *Innis* definition includes undercover

operatives, or whether this was an *ex parte* examination by one person over another, but Duggins

challenges the government to provide a First Circuit or Supreme Court case which has addressed

the precise issue head-on – that an informant (working as an agent for the police) being sent to

create a record of past events for future prosecution, and proceeds to engage in a structured

question and answer of the declarant ("interrogation") would not amount to testimonial evidence

under *Crawford*.[20]   However, and once the government learns that any venture would be futile to

come up with any *stare decisis* to overrule the argument which Duggins' presents here, Duggins

envisions another strategy by them – claiming that if the statements from Gutierrez were made in

furtherance of the conspiracy, that they would be "non-testimonial" and outside the scope of the

Confrontation Clause.

### a. First, it is true, that statements made in furtherance of the conspiracy are considered to be non-testimonial.

Duggins concedes that any finding by this Court which opines that Mr. Gutierrez's

statements were made in furtherance of a conspiracy would have support that they are not subject

---

[20] The government may cite to *Bourjaily v. United States,* 483 U.S. 171 (1987) (the government introduced, over petitioner's objection, statements which the defendant said to a government informant over the phone during the **commission** of a drug deal).  However, that case was decided in 1987, and while it is most certainly not overruled, it did not involve the issue here – a government agent sent to create a record for trial regarding **past** events.

to Sixth Amendment concerns.  *United States v. Rivera-Donate*, 682 F.3d 120 n. 11 (2012)

(citing *United States v. Malpica-Garcia*, 489 F. 3d 393, 397 (1st Cir. 2007) (citing *Crawford v.*

*Washington*, 541 U.S. 36, 56 (2004)).  However, and if this Court were to also find that the

Gutierrez statements also meet the definition of "testimonial" under *Crawford* and *Davis*, such a

holding would therefore create a type of tension of perhaps dramatic dimension, and tension with

any co-existing opinion by this Court that the Gutierrez statements were "non-testimonial", since

they were made in "furtherance" of a conspiracy.  However, our Circuit has not even

acknowledged this tension, other than inferentially, by pointing to the *Crawford* Court who of

course has the final say.  *See e.g., United States v. Sanchez-Berrios*, 424 F. 3d 65, 75 (1st Cir.

2005) (deferring to *Crawford*, which "explicitly recognized that statements made in furtherance

of a conspiracy 'by their nature [are] not testimonial'").[21]

> ### b.  However, there is no ruling by the Supreme Court that statements made in furtherance of a conspiracy could never be testimonial.

However, and when Duggins reviews Justice Scalia's opinion in *Crawford*, we see his

opinion merely acknowledging the principle – that statements made in furtherance of a

conspiracy are non-testimonial.  *Crawford*, at 56.  By that acknowledgement however, Duggins

sees no ringing endorsement by Justice Scalia of the premise that statements made in furtherance

of a conspiracy could *never* be testimonial as well, and in spite of the co-existing nature of the

statements, they *must* still be admitted under Federal Rules of Evidence.  Duggins believes this is

not the case as Justice Scalia also held that the Sixth Amendment does not bow to the whims of

the federal rules of evidence.  *See id.* at 61, (Where testimonial statements are involved, we do

---

[21] To be sure, the defendant in *Sanchez-Berrios* did involve a co-conspirator statement which implicated *Sanchez-Berrios* for a drug conspiracy where *Sanchez-Berrios* expressed "enthusiasm for the task".  *Id.* at 74.  However, there was no claim made by *Sanchez-Berrios*, that law enforcement sent a confidential informant to go interview him on pre-existing crimes, in order to create a record for trial – the epitome of the definition of "testimonial".

not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the

rules of evidence, much less to amorphous notions of "reliability".) .  Justice Scalia rounds up

this point poignantly.  See below:

> "[W]e once again reject the view that the Confrontation Clause['s] . . .
> application to out-of-court statements . . . depends upon the law of
> evidence for the time being.  . . "

*Id.* at 61, (*quoting* 3 John Henry Wigmore, a treatise on the Anglo-American System of Evidence
in trials at Common Law sec. 1397 at 101 (2d ed. 1923).

There can be no question that the *Crawford* Court ruled that absent a prior opportunity

for cross-examination, if the witness is unavailable at the time of trial, a statement that is

"testimonial" and offered for the truth of the matter asserted, would be barred from trial unless

the defense can confront that evidence.  *Id.* at 68.  This assessment takes (and Duggins contends

rightly so) an "originalist" approach to the meaning of the Confrontation Clause at the time of its

adoption by the Framers, and Justice Scalia emphasized its test, focusing on "witnesses" who

"bear testimony".  *Id.* at 51 ("The text of the Confrontational Clause. . . to 'witnesses' against

the accused – in other words who "bear testimony". . . "Testimony", in turn, is typically "[a]

solemn declaration . . . made for the purpose of establishing some fact").[22]

As a result of the above, Duggins contends that the question is begged, whether both can

actually exist within the same world: 1) statements which are created for the purpose of

establishing some fact (being therefore testimonial); and at the same time 2) also being made in

furtherance of the conspiracy (and therefore non-testimonial)?   And if possible, which rule of

admissibility would hold superior?   Duggins' review of Supreme Court precedent does not

demonstrate their take on this precise issue of whether co-conspirator statements made in

furtherance of the conspiracy could also be testimonial, and neither has (to Duggins' knowledge)

---

[22] Justice Scalia takes the definition of "testimony" from 2 N. Webster, An American Dictionary of the
English Lanuage (1828).

this Circuit.  However, both the Supreme Court and this Circuit have found in other instances

where evidence can not only be both testimonial and inadmissible under *Crawford*, but also

admissible under a relevant hearsay exception which characterizes the evidence as non-

testimonial, but where the Confrontation Clause takes precedency.

### 4.  *Melendez-Diaz v. Massachusetts*

The case of *Melendez-Diaz v. United States*, 129 S. Ct. 2527 (2009) involved the issue of

whether drug analysis certificates from this Commonwealth are admissible without confrontation

of the person who authored them.   Once upon a time, these documents were routinely deemed as

business records, and admissible under the "business records" exception to the hearsay rule, as

they were considered "non-testimonial", and thus not in violation of the Confrontation Clause.

*Id*. at 2527, 2538.  Not any more after *Crawford v. Washington*.   Justice Scalia again wrote this

opinion in *Melendez-Diaz,* and held the following:

> "As we stated in *Crawford*: "Most of the hearsay exceptions covered
> statements that by their nature were not testimonial – for example,
> business records or statements in furtherance of a conspiracy. "541 U.S.
> at 56.  Business and public records are generally admissible absent
> confrontation not because they qualify under an exception to the hearsay
> rules, but because – having been created for the administration of an entity's
> affairs and not for the purpose of establishing or proving some fact at trial –
> they are not testimonial. Whether or not they qualify as business or official
> records, the analysts' statements here – prepared specifically for use at
> petitioner's trial."

*Melendez-Diaz*, at 2539-40.

This holding as it pertains to business records becomes quite interesting for the instant

analysis.   This is because, and although the analyst reports could be found to be business

records, and therefore admissible as non-testimonial evidence and free from any violation of the

Confrontation Clause on the one hand, on the other hand the *Melendez-Diaz* Court also found

that since the records were prepared specifically for use at trial, the business records also

amounted to testimonial evidence, and therefore subject to confrontation under the Sixth

Amendment.  *Id.*  Furthermore, we can see similar reasoning also adopted in this Circuit on the

same issue. *See e.g., United States v. Cameron*, 699 F.3d 621 (2012) (Court finding business

records by Yahoo, created for the primary purpose of establishing or proving past events

potentially relevant to later criminal prosecution, was testimonial and excluded it under the

Confrontation Clause, even if considered admissible under the hearsay exception, and thus non-

testimonial);  *see also United States v. Pursley*, 577 F. 3d 1204, 1223) (10th Cir. 2009) ("[E]ven

if a statement qualifies for an exception to the hearsay doctrine-based upon judicially fashioned

reliability principles – the statement's admission may violate the Sixth Amendment's mandate

for 'confrontation' if it constitutes testimonial hearsay."  (citing *Crawford*, 541 U.S. at 61-62;

*Melendez-Diaz*, 129 S .Ct. at 2533).

      As a result, Duggins contends that if the Gutierrez statements are considered "testimony"

under *Crawford and Davis*, then it matters not that his statements could also be considered "non-

testimonial" under some federal rule of evidence.  To merely qualify as a testimonial statement,

all Duggins needs to show is that the statement has a "primary purpose" of establishing or

proving past events potentially relevant to later criminal prosecution.  *Davis,* at 822.  Duggins

contends that based upon these facts – and perhaps the remarkable nature of the isolated fact-

pattern here separates it from the masses of other cases, whereas here CW-13 was sent

specifically to create a laundry list of facts proving past events which are relevant to later

prosecution, Gutierrez's statements must be testimonial, and barred under the 6th Amendment. [23]

---

[23] Duggins also contends that this fact-pattern (Gutierrez's statements to CW-13) would separate itself
from the statements made by Erick Lopez to various CW's, as discussed *supra*.  This is because and when
one reviews Mr. Lopez's statements, we don't see the interview styled approach as conducted by CW-13,
nor did it appear that the CW's (in Lopez's case) were sent with a pre-engineered script, to get Lopez to
regurgitate the previously obtained incriminating statements, as we saw with Gutierrez.

# II.

## IN ANY EVENT, CONFRONTATION DISPUTE OR NOT, THE STATEMENTS MADE BY SALVADOR GUTIERREZ WEREN'T MADE IN FURTHERANCE OF THE AGREEMENT HE HAD WITH MS-13 (or DUGGINS) TO INFLICT VIOLENCE AND FEAR

Under the Federal Rules of Evidence, which became effective July 1, 1975, a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy", and may be introduced as the non-hearsay admission of a party opponent. Fed. R. Evid. 801(d)(2)(E); *see also United States v. Díaz,* 670 F.3d 332, 348 (1st Cir. 2012); *United States v. Fogg,* 666 F.3d 13, 15 (1st Cir. 2011). The proponent of such a statement (that being the government) must prove, by a preponderance of the evidence, that the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy. *United States v. Famania-Roche,* 537 F.3d 71, 76 (1st Cir.2008); *United States v. Bradshaw,* 281 F.3d 278, 283 (1st Cir.2002). A district court's determination "as to whether this burden has been met is known in this circuit as a *Petrozziello* ruling," after *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977). *United States v. Mitchell,* 596 F.3d 18, 23 (1st Cir.2010); *see also Famania-Roche,* 537 F.3d at 75.

Since this Court has invited the Defendant to move *in limine* for an analysis under this doctrine, he also moves under *United States v. James*, 590 F. 2d 575 (1979) for a hearing (evidentiary or by proffer if need be) to determine whether the offered statements were made during the course of and in furtherance of the conspiracy.[24]  Regarding the "during the course of the conspiracy" requirement, the government must prove that "[Duggins] was a coconspirator of

---

[24] *See United States v. Whitley*, 670 F. 2d 617, 620 (5th Cir. 1982) (citing *United States v. James*, 590 F.2d 575 (5th Cir. 1979) ("This procedure has entered the legal lexicon in this circuit as the *James* hearing or *James* determination).

[Gutierrez], and that the conspiracy existed at the time the statements were made. *United States v. LiCausi¸* 167 F. 3d 36, 46 (1st Cir. 1999).   Duggins contests that he was involved in any conspiracy to commit racketeering acts with Mr. Gutierrez, and challenges the government to provide proof "independent" of the recordings, to establish that he was.  *See Bourjaily* at 177 (the court must determine by independent evidence that the conspiracy existed and that the defendant and the declarant were members of this conspiracy).  The only issue left to address is the "in furtherance" requirement.

### A.  The in furtherance requirement

The proponent of the out-of-court statement (typically, the government) is not entitled to a free pass.  *United States v. Piper*, 298 F.3d 47, 54 (2002).  A judicial determination that a coconspirator's statement tended to further the conspiracy must be supported by some plausible basis in the record. *United States v. McKeeve,* 131 F.3d 1, 12 (1st Cir.1997).  To that extent, the "in furtherance" requirement represents a real limitation on the admissibility of coconspirator statements. *See Garlington v. O'Leary,* 879 F.2d 277, 283 (7th Cir.1989); *United States v. Fahey,* 769 F.2d 829, 839 (1st Cir.1985).  In appreciating this limitation, the "in furtherance" requirement calls for communications which deal with assisting or achieving the conspirators' common objective. *Fahey,* 769 F.2d at 838-39. (Generally speaking, however, a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy) .

The "in furtherance" question defies mechanical solutions: there is no precise formula for determining whether a coconspirator statement advances a conspiracy.  *Piper*, at 54.   In determining whether a statement is actually made "in furtherance" the focus is not on the actual effect in advancing the goals of the conspiracy but on the "declarant's intent in making the

statement*".   United States v. Zavala-Serra*, 853 F. 2d 1512, 1516 (9th Cir. 1988).  Co-conspirator statements need not actually further the conspiracy to be admissible, so long as they were intended to further it. *United States v. Hamilton*, 689 F. 2d 1262, 1269-70 (6th Cir. 1982) (statements admissible even though government investigation made actual furtherance of the conspiracy impossible). Even this circuit has acknowledged this approach. See *United States v. Tse*, 135 F. 3d 200, 209 (1st Cir. 1998) (recognizing other circuits addressing this issue have held that the inquiry should focus on the declarant's intent, making the intent of the one who receives the information immaterial, *see U.S. v. Gutierrez,* 48 F.3d 1134, 1137 (10th Cir.1995); *U.S. v. Williams,* 989 F.2d 1061, 1068 (9th Cir.1993).

**1. Where a declarant's intent amounted to idle chatter, narrative declarations, or casual conversations between co-conspirators, that showing would be insufficient as a matter of law for the statement to be made in furtherance of the conspiracy.**

As far as a declarant's intent, it is well established in circuits far and wide, that if the intent by the declarant amounted to "idle conversations", "narrative declarations", or "casual conversations" between co-conspirators, that would not be enough.  *United States v. Snyder*, 930 F. 2d. 1090, 1095 (5th Cir. 1991) ("Mere idle chatter" even if prejudicial and made among co-conspirators, is not admissible under 801(d)(2)(e); *United States v. Mangan*, 575 F. 2d 32, 44, 45; (2nd Cir. 1978) (boasts or idle gossip not admitted);  *United States v. Taratineo*, 846 F. 2d 1384, 1412 (D.C. Cir. 1988) (casual comments to people inside the conspiracy not in furtherance) (quoting *United States v. Snider,* 720 F. 2d 985, 992 (8th Cir. 1983); *United States v. Santos,* 20 F.3d 280, 286 (7th Cir.1994) ("[N]arrative discussions of past events... do not satisfy the `in furtherance' requirement of Rule 801(d)(2)(E)."). *United States v. Darwich*, 337 F. 3d 645 (6th Cir. 2003) (idle chatter or casual conversation about past events is not considered a statement "in furtherance of the conspiracy); *United States v. Desena,* 260 F. 3d 150 (2nd Cir. 2001) (we

agree that it is difficult to construe casual story telling in a bar, more than two years after event, as anything but "mere idle chatter"); *United States v. Moore,* 522 F. 2d 1068 (9th Cir. 1975) (statement where at best, was nothing more than declarant's casual admission of culpability to someone he had individually trusted). *United States v. Warman,* 578 F. 3d 320, 338 (6th Cir. 2009) ([M]ere idle chatter or casual conversation about past events not considered a statement in furtherance of the conspiracy.").  *See also United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012) (First Circuit acknowledging rule in *Warman*, but then holding that Ciresi's statements were not "simply idle chatter or narratives of past events");

    **a.  Malicious gossip also doesn't qualify.**

    Furthermore, with respect to idle chatter or casual storytelling, it should not fall on deaf ears that people tend to gild the lily, even sometimes using "malicious gossip" to advance their own agenda.  See *Bourjaily*, 107 S. Ct. at 2790 (Blackmun, J. joined by Brennan and Marshall, JJ. dissenting) ("[C]o-conspirator statements often have been considered to be somewhat unreliable.  It has long been understood that such statements in some cases may constitute at best, nothing more than the 'idle chatter' of a declarant or at worst, ***malicious gossip***) (emphasis added) accord *Wong Sun v. United States*, 371 U.S. 471, 490 n. 17 (quoting *Williams*, *The Proof of Guilt* (1958)).[25]

_____

[25] "Even where. . . the evidence of an accomplice becomes admissible against his fellows, it remains suspect evidence because of the tainted source from which it comes.'");  Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions:  A Functional Analysis, 85 Harv. L. Rev. 1378, 1386-87 (1972) (statements made by a co-conspirator prior to termination of the conspiracy "may . . . suffer from the same kinds of self-serving motive and possibly faulty memories that allegedly infect many post-termination statements");  Levie Hearsay and Conspiracy:  A Reexamination of the Co-Conspirator's Exception to the hearsay rule.  52 Mich. L. Rev. 1159, 1165-66 (1954) ("The Conspiracy's interest is likely to lie in misleading the listener into believing the conspiracy stronger with more members (and different members) and other aims than in fact it has".

**2. Considering the well accepted principle which discounts random and idle conversations between co-conspirators in the context of the "in furtherance" calculus, the Court must still ask the government what was Gutierrez's intent when he engaged in what appears to be a random conversation with CW-13, which appeared only to chronicle past events, and even include malicious gossip? It wasn't to *further* the conspiratorial objectives of MS-13 – that's for sure.**

Duggins seeks for this Court to answer one question before ruling on the issue of "in-furtherance":

***What was Gutierrez's intent by speaking with a fellow MS-13 member who:***

> a) was locked up in jail with him;

> b) in what appears to be a casual conversation between them;

> c) which chronicles all of Gutierrez's past life-experiences with MS-13 in general and the Sykos Clique in particular; and

> d) which included some random factoids about Duggins, and malicious gossip about another clique member?

As it pertains to the random factoids about Duggins, they include the following:

> 1. Duggins getting out of jail and appearing to resume operations inquiring about recent jump-ins and asking Gutierrez if he had decided about joining the Sykos Clique (statement #1);

> 2. Duggins being the present first word leader of the clique (statement #2);

> 3. Gutierrez finding out through Duggins  (a disputed fact) the password of Herson Rivas' phone, where it was thereafter believed that his phone contained evidence of his alleged cooperation (statement #3);

> 4. After the murder of Herson Rivas, Duggins going to the park and to look for cameras (statement #4); and

> 5. Duggins telling Gutierrez that when he goes to kill a dude don't kill with Mayimbu – because Mayiumbu likes to talk, suggesting that he (and Gutierrez) have a negative opinion of Mayimbu. (statement #5).

Again, what was Mr. Gutierrez's intent when he decided to open up to CW-13, and say all of the aforementioned regarding his past crimes and involvement with the Sykos Clique?

Was it to boast and to brag?  Was it engage in the latest gossip of the day regarding his clique?

Was it a casual conversation amongst believed comrades about "idle" matters?  Was it to provide

malicious gossip about Mayimbu, on how he talks too much?  Or perhaps all of the above?

Duggins would presume the government has an alternative reason – that the statements were

made by Gutierrez with the intent to "advance" and/or "promote" the conspiratorial objectives

which have already been outlined, indisputably distilled down to mere **violence** and fear.

Appreciating further that it is the government's burden and not Duggins to demonstrate what

Gutierrez's intent was, Duggins will wait to see what the government will say what was

Gutierrez's intent, and Duggins will take up any rebuttal in his reply.   However, and to keep the

government on the straight and narrow, Duggins would like to alert them (and this Court) of

some relevant considerations which they must also contend with, when they make their

arguments:

> Statement #1 –  The historical background, regarding how many random people have actually joined the Sykos Clique, including Duggins' interest in the same, is *irrelevant* on promoting violence and fear by the Sykos Clique, but speaks moreso to idle matters or a narrative of past events.

> Statement #2 – Whether Duggins is the present leader of the Sykos Clique, or not, and the only reason why he is the present leader, is due to another candidate having too many kids, is *irrelevant* on promoting violence and fear by the Sykos Clique;

> Statement #3 – Duggins contends that no mention is made of him, and requests the government to provide a more accurate translation of their suggested language.[26]

> Statement #4 – Duggins going to check for cameras after the murder, appears to be again, a narrative on past events, and does nothing to promote the conspiratorial objectives as outlined in the indictment.

---

[26] *See exhibit 6,* affidavit of Djavier Duggins.

28

    Statement #5 – Gutierrez explaining to CW-13 how Mayimbu talks too much, and that he regretted "killing with him", and then corroborates his regrets with a quote by Duggins, claiming "never kill with Mayiumbu" – would be words amounting to "malicious gossip".[27]

  Furthermore, the government should think twice about arguing that Gutierrez's intent was merely to keep CW-13 abreast of the current events of the Sykos Clique.  *See e.g., United States v. Maldonado- Rivera,* 922 F.2d, 934, 958-959 (2nd Cir. 1990) (statements between coconspirators may be found to be in furtherance where they inform each other as to the progress or status of the conspiracy).   While perhaps such an intent may advance the conspiratorial objectives of some conspiracies, such an intent wouldn't advance this one.  This is because, and according to the government's own witness (S.A. Jeff Wood) the rules of MS-13 prohibit a member from one MS-13 clique, to discuss gang business with a member of another MS-13 clique.  *See exhibit 5.*  As such, Duggins submits that if Gutierrez's intent was to merely update a fellow member of MS-13 (which the government can't even prove), that intent would be inconsistent with the conspiratorial goals of this organization, which seems to prohibit this.  Since the government is claiming that Mr. Gutierrez is a card-carrying member of MS-13, a reasonable inference comes thereafter that Gutierrez is familiar and makes it a point to follow gang rules.  Appreciating this point, Duggins will leave it to the government to explain why one of the conspiratorial objectives of MS-13 is to keep clique business closed to only clique members, but in this instance, Mr. Gutierrez does something to "thwart" that objective.  See *United States v. Fahey*, 769 F. 2d 829, 839 (1st Cir. 1985) ("...a damaging statement is not

---

[27]  When Duggins characterizes the passage amounting to "malicious gossip" he encourages the government to take another look at the language and put it in its proper context.   It would appear that Gutierriez is having a real problem with MAYIMBU, citing instances where he likes to "show off" in front of girls, and talking too much.   The passage was an indictment against MAYIMBU's lack of maturity when it came to clique business, where Duggins was called into the discussion for support.

admissible under 801(D)(2)(E) unless it tends to advance the objects of the conspiracy as opposed to thwarting its purpose.").[28]

Lastly, Duggins would also like to remind the government that the statements given above are merely an account of information, given by one person in jail to another.  There is no indication (either way) that Gutierrez had any pre-existing knowledge of why CW-13 was in jail, or for how long, or even if he was subject to deportation, never seeing U.S. soil again.  As a result, its hard to fathom how Gutierrez had any appreciation for what (if anything) CW-13 would do with this information, where he had no idea what CW-13's destiny would be, let alone expected that CW-13 would use the information he provided to further any conspiratorial objective – the impossibility of the notion notwithstanding.   In sum, Duggins contends that Gutierrez's autobiography provided to CW-13, may make for some fascinating reading for a person who has an interest in such inexplicable behavior, but none of it advanced the present conspiratorial goals of MS-13, but merely was a narration for the listener of Gutierrez's trials and tribulations with the alleged enterprise.

### III.

### THE SAME WOULD APPLY TO ANY AND ALL STATEMENTS MADE BY ERICK LOPEZ TO CW-1 AND CW-17

Without taking up too much time, Duggins also seeks to exclude any and all statements made by Erick Lopez to CW-1 and CW-17.  The transcripts of these statements are provided as *exhibits 7 and 8* respectively.   Duggins will state the specific passages which he seeks exclusion.

---

[28] Again, where the Court is left to speculate why Gutierrez broke gang rules by even talking with CW-13 about clique business, Duggins would chime in and suggest that where Gutierrez would be subject to being "green-lighted" where he falsely accused CW-13 of being a cooperator, maybe Gutierrez felt coerced to being forthcoming with CW-13, where he had to make amends for his ill-advised accusation or suffer his own demise.  The problem for the government is that they too can only provide speculation in all of this.  Unless the statements suggested on their own some intent to further the conspiracy (which they don't) the government is left with two pairs, trying to make a full house.

**Exhibit #8 - April 18, 2015 Lopez Transcript.**

**P. 4**

CW-1:                          Has GUANACO been arrested?

MAYIMBU:                 He was caught, dude! The guy knows what happened! I'm going to let this
                                 guy tell you the whole thing.

DELINCUENTE:         As you know, we have that homeboy, HAZE, buddy. He's First.

CW-1:                          Yes.

DELINCUENTE:         I'm going to tell you why the guy is inside. The issue is he even tried to
                                 call HAZE, or for him to help him. "What's going the fuck on,
                                 DELINCUENTE has UI, I think UI." And HAZE told him, "Dude, I'm
                                 not outside there, those dudes will decide, you know."

        This above passage, appears to suggest that while "HAZE" [Duggins] while in jail,

whether he was "First" or otherwise, he is not in any position to speak about anything going on

with the Sykos Clique.  First, Duggins contends that the government must show a conspiratorial

agreement between himself and "DELICUENTE".  *See United States v. LiCausi¸* 167 F. 3d 36,

46 (1st Cir. 1999) (regarding the "during the course of the conspiracy" requirement, the

government must prove that "[Duggins] was a coconspirator of [DELICUENTE], and that the

conspiracy existed at the time the statements were made".).  Second, and again, where CW-1 was

not a member of the Sykos Clique, this communication would not be in furtherance of the

conspiracy, let alone advance the conspiratorial objective of violence and fear.

**P. 12**

CW-1:                          Yes, but HAZE is almost out, right?

MAYIMBU:                 Yes, he has twelve more months. One year to go.

CW-1:                          Oh, almost!

MAYIMBU:                 Yes, those dogs are about to get out, dude. You'll see then, dude. Lynn
                                 will be UI.

This passage appears to speak to Duggins' "wrap-up" date from prison.   This again is idle chatter, almost trivial, as it does nothing to further the conspiratorial objectives.   Further, if the government contends that the when Duggins gets out of jail is relevant to "clique business", since CW-1 is not a member of Sykos Clique, the statement would not be made with the intent to further the conspiracy, as it "thwarts" one objective of MS-13, which is to keep clique business private.

**P. 14**

MAYIMBU:          Yes, buy you guys because you guys are older, man.

CW-1:               Exactly.

MAYIMBU:          That's the thing. We, in 2006 and the years when I was born in Barrio, that's when the clique got going, dude. Because before, when the clique was here in Lynn, dude, before... without being disrespectful, but we didn't have garbage, dude. Over here, the representatives we had previously, dude, would not stand up for us. They allowed the Dominicacas come and shit on us. That's why, since I was jumped in, dude, HAZE and a culera garbage that used to be called Chris, we took over the clique. We took over the clique.

CW-1:               That's awesome.

MAYIMBU:          And now, all this pride, man, in Lynn, comes to us. We were the ones that raised up the clique. Before, we got no respect, nothing. We were buried.

CW-1:               And now...

MAYIMBU:          And now, I'm telling you. Any son of a bitch from Lynn can tell you who the four of us are. We are DELINCUENTE, the one we just dropped off; SHADOW, HAZE and me.

This passage has MAYIMBU explaining some historical background about the Sykos Clique, indicating "we took over the clique" – it being Duggins and others.  Again, this appears nothing more than a narration of past events with no present intention to further any conspiratorial objectives.

**P. 15**

| | |
|---|---|
| CW-1: | Isn't this guy DELINCUENTE? |

MAYIMBU:   Yes, that the dude I mean. DELINCUENTE, HAZE, SHADOW and me, dude. The four of us. If you ask all the dudes in Lynn who MAYIMBU is, they will tell you right away, dude. That's why I walk around full of pride in this city, dude. We have really beaten and shot here, dude. Even I…once, fourteen Vacas Locas [Mad Cows] sons of bitches attacked me and I alone beat them up. I lifted up the two letters.

CW-1:   Fuck, dude, that's awesome.

MAYIMBU:   By myself I fought Vacas Locas, and I didn't even fall down to the fucking ground!

CW-1:   That's awesome!

MAYIMBU:   I, dude, here in Lynn I am respected, dude, that why I never react to what people say.

CW-1:   What about this GUANACO?

MAYIMBU:   That guy hasn't done shit! He annoys me, dude. I already warned DELINCUENTE, man. The day I take him out, I won't even have to tell him, I said. I will fire the first shot.

CW-1:   So he doesn't come by?

MAYIMBU:   The dude knows. HAZE told him, "Hey dude, I don't know what's going on, but you have to fix things with these dude, because they are the ones that are outside, you have to report to them, not to me," he told hi. So GUANACO said no, that DELINCUENTE called him UI… so the guy ignored us. But GUANACO, I'm telling you, dude. And NIGHTMARE, one of ours that you know, that guy has the green one, dude.

Duggins is unclear what MAYIMBU is trying to convey, except that again, it speaks to a time when Mr. Duggins was in jail and MAYIMBU appears to be at war by himself, and Duggins is telling MAYIMBU to leave him alone. At any rate, this is once again a narrative of past events, with no evidence that Erick Lopez intended to further the conspiracy by the statement.

33

**Exhibit #9 December 29, 2017 Erick Lopez Recording**

**P. 13-15**

CW-17:      What did you do with them?

MAYIMBU:      The other one I gave to SHADOW; the other one I sold. I got 200 for the 45. Fuck, at that time when I got out of jail. I didn't have money, I didn't have a job. The 12 that wasn't mine was left here. I returned it to SHADOW. Around here, dude, before I went to jail, we were always here on this street, dude. We used to fight with everyone on this street. On Christmas, dude, UI with everyone, we beat them up. The guys that had a party came outside, dude, in the morning, HAZE was there, DELINCUENTE and I, dude. We went at them with everything we had, two ounces. We were walking back from the store, when we saw two Chinese guys on the porch. They were smoking. One guy was standing, I mean, from head to foot he was dressed in red.

TRISTE:      Son of a bitch.

MAYIMBU:      So to be fresh, I said. "Oh, so we have the tomatoes at the corner, then!: The dude came down, dude, "Who said 'tomatoes! Here, there are Bloods!" When UI, HAZE hit them in the air. We exploded them there. There were eight, dude. The three of us exploded them, dude. We wound up here, dude, fighting them. Thye came back here. Because they were fighting us, dude.

TRISTE:      Yes, yes.

MAYIMBU:      "Open the door for us!"

TRISTE:      Yes.

MAYIMBU:      And UI outside there with HAZE. And those guys attacking me with everything.

TRISTE:      Yes.

MAYIMBU:      They even hit me on the face with a shovel.

TRISTE:      Fuck, bro'!

MAYIMBU:      That was when HAZE got mad and grabbed a stick and started hitting those sons of bitches. Then I was able to open the door. We took everything out,

TRISTE:      Yes. You got them.

This appears to be a passage where MAYIMBU is telling gang business to at least one outsider—CW-17.   What from Duggins' gathers, MAYIMBU is talking about some past instance of violence.   Duggins relies upon his previous arguments to supporting that Lopez did not make this statement in furtherance of the conspiracy.

## P. 22

CW-17:          You know. It was different before.

MAYIMBU:   A lot of things dude, Fuck. One needs to be careful about what one says, dude. Oh, yes, I was going to talk about this girl, she was a chequeo with UI. She was called LITTLE CASPER. That guy, they blindfolded him and they killed him at SHADOW's house. We were drinking, and the guy drops in and starts to talk, dude. "oh, that guy, he was my friend." UI…"Yes. He would come to my house, we would eat together ," and everything, dude… "Are you talking about the guy that was murdered?" We don't talk about things like that with dudes that weren't in MS but that wanted to be in it, we wouldn't talk about that kind of stuff. "Oh, really? Oh…" The ude, stands up. HAZE comes over and takes his beer from him. He says, "Hey, dog, what are you doing with my beer?" "No, dude, wait. Did I not tell you to go UI with that chavala?" "Yes." Boom! Son of a bitch!" I see HAZE, boom, son of a bitch! Then SHADOW went, boom! And me. We all exploded him. That guy didn't UI.

CW-17:          You know. Fucking up!

MAYIMBU:   UI. Yes, it was five or three years ago. Fuck, dude. Fucking shit up! We couldn't be together because we were just wild! UI every Friday. Yo, the Sykos, dude, we were the clique because we would just drop in to cause chaos! And we would fight anyone! It could be a Homeboy, garbage, snitch. We didn't give a fuck! UI. Slept over there, dude. UI would say, "Leave the Sykos." They would all grab their girls.

This appears to be a passage where MAYIMBU is telling gang business to at least one outsider—CW-17.   What from Duggins' gathers, MAYIMBU is talking about some past instance of violence.  Duggins relies upon his previous arguments to supporting that Lopez did not make this statement in furtherance of the conspiracy.

## P. 23-24

TRISTE:              What year did you get jumped in?

MAYIMBU:            I was jumped in in 2006, but I came here in 2002. I started out with that dude, I met CASPER. CASPER wanted me to join the East Sides, But I became Sykos, because I thought, "Dude, I live in Lynn. There's a clique in Lynn. I'm going to join something in Lynn." And I went with the Sykos. CASPER was furious. He really wanted me to join East Side. HAZE too, dude. The East Sides also wanted HAZE, dude. Our clique in Lynn, dude, UI, yes, dude. The East Sides, if it weren't for the East Sides… it was the East Sides that started us up here in Lynn, because the East Sides used to live here in Lynn before. But in '98 I think, two members of the East Sides were murdered.

This appears to be a passage where MAYIMBU is talking about how some other gang (or clique) wanted Duggins to join.  Duggins relies upon his aforementioned arguments to state that Lopez did not make this statement in furtherance of the conspiracy.

**P. 37-38**

STREET CRAZY:      You know, it's critical to see what's up, check it first, to make sure it's not something that is dirty.

MAYIMBU:            We had two 380s. We lost one when we did a hit once. The other one was under this guy's house. There we attacked the tomatoes shooting at them too. We created chaos, dude. That one I really liked because it was very small and it was a 9, dude. The fucker was loud. We lost it… One time, UI lent me a 38. A tomato was from here to here, and I had it, I pulled the trigger and HAZE was next to me because he had the machete. I was pulling like this, I pulled the trigger, dude and it didn't work, dude. Itw was stuck, dude. The bullets didn't come out, dude. Nothing. They were stuck there. It didn't work. Dude, fuck, I had the boy right in the face, dude. Like this, I pulled the trigger. When HAZE saw that the thing didn't work, he attacked the guy with machete blows. It wasn't that mother-fucker's day. I'm telling you, I had him just like this.

STREET CRAZY:      The guy was already drunk.

MAYIMBU:            It wasn't that mother-fucker's day, dude… in Lynn, it's only recently that chavalas have been arriving there. Before, it was all tomatoes. Deuce Boys, Cacas and Tomatoes. From here we would go with the dudes in Chelsea, Somerville, Everett…

This appears to be a passage where MAYIMBU is telling gang business to at least one outsider—CW-17.  What from Duggins' gathers, MAYIMBU is talking about some past instance of violence.  Duggins relies upon his previous arguments to supporting that Lopez did not make this statement in furtherance of the conspiracy.

## **CONCLUSION**

For the foregoing reasons, Duggins respectfully asks this honorable court to exclude the statements of Salvador Gutierrez and Erick Lopez.

 Respectfully Submitted,
DJAVIER DUGGINS
By his Attorney,

/s/ Gordon W. Spencer
Gordon W. Spencer, Esq.
BBO #630488
945 Concord Street
Framingham, MA 01701
(508) 231-4822

Dated:    September 4, 2020

**CERTIFICATE OF SERVICE**

I, Gordon W. Spencer, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 4, 2020.

/s/ Gordon W. Spencer