UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | Case No. 18-cr-10450-MLW |
| **DJAVIER DUGGINS** | |

SENTENCING MEMORANDUM OF DJAVIER DUGGINS

INTRODUCTION

**Djavier Duggins' Sentence Rises and Falls Upon the Government's Desired Leadership Enhancement – see below:**

> "Although the government has not sought the conspiracy to murder guideline for all MS-13 defendants in the past. . . in **certain** situations [involving leadership, it can where]. . . against whom there is **insufficient** proof of their personal participation and **insufficient** proof tying them to a specific victim. . . in such cases, the conspiracy or solicitation to murder guidelines should apply."

*See governmental objection #1 to the draft PSR prepared by probation against Djavier Duggins.*

The above quote serves as the reason for why a MS-13 operative can go to jail for 20 years of his life, but without any specific evidence of him engaging in violent conduct.  In 2018, Mr. Djavier Duggins ("Duggins") had been hitched to a caboose of a RICO federal indictment which has alleged one specific murder to which the government cannot prove his involvement. The government's *core* explanation for why this is so?  It's because they believe and to quote them further: "at the very least, there is compelling evidence that Duggins was a "**leader**" of a violent MS-13 clique whose core mission involved seeking to murder rivals and those who were disloyal to the gang". *Id.*   The government also gives their signature example of how such a selective guideline calculation applies to some but not to all.  *See e.g., United States v. Jose*

*Adan Martinez Castro,* No. 1:15-cr-10338-FDS (notorious MS-13 leader of the entire East Coast (based in Virginia) received a "conspiracy to murder" guideline even though he has slayed no one). When branding Castro with this leadership enhancement, the government's argument was simple – not only does such a title (generally) shows knowledge and encouragement of murder, but also (and more specifically) ***Castro himself was actually recorded*** during a meeting which he presided over (and at his home) on behalf of El Salvador, letting his murdering banter speak for itself. *See docket entry #* 2595 – the government's sentencing memorandum of Castro. As a result of his labors, defendant *Castro **talked and led*** his way right into a 235 month sentence handed down by Judge Saylor. *Id.* at *docket entry #* 2610.

Now and here, it would appear that the government believes that Duggins should also get this selective treatment, and even though they have no evidence that he himself said or led anything on behalf of El Salvador. They are advocating that he should receive the same 20 year sentence as the leader of the entire East Coast Program, supporting it with some parallel belief that Duggins exemplified "leadership" in racketeering. *See PSR* at *¶* 152. Duggins' storyline however, is not akin to Castro's – who was a supreme leader of the enterprise, as Castro held an executive office position within the regional headquarters located in Virginia. Notwithstanding Castro's significant connection to the MS-13 enterprise, the government also seeks to put Duggins within the same box of significance. They do this by attaching a generic and unspecified leadership role over Duggins' membership, while he was connected with a "satellite" office in Lynn – the Sykos Locos Salvatrucha (hereinafter "SLS" clique or "*Sykos*") clique. *Id.* By the way, it should also be mentioned that this satellite office appeared to be conducting its' business (by killing its' own members) without any leadership administered by Duggins. *Id.* at ¶ 117. As a result, how can this parallel between Mr. Duggins and Mr. Castro be upheld?

At any rate, we can now see what Duggins' upcoming sentencing hearing will be all about – it's whether the government can prove that he was the leader of *Sykos*, and thereby getting the "Castro treatment" of 235 months, or instead, and without such proof, Duggins should only get the "member treatment".  *See e.g., United States v. Henry Santos-Gomez,* No. 1:15-cr-10338-FDS (government's sentencing memorandum (*dkt #* 1807) at pages 2-3 recommends a "19" base offense level for a MS-13 operative (and actually leader), due to their inability (or "litigation risk") in proving attempted murder listed in the indictment).  Judge Saylor gave this uncontested leader/defendant-Santos Gomez 72 months.  *Id. at dkt* #1826;  *See also United States v. Edgar Pleitez*, No. 1:15-cr-10338-FDS (government's sentencing memo (*dkt #* 2585) at pages 1-2 recommends a "21" adjusted offense level acknowledging defendant was a "homeboy" in the EBLS clique of MS-13, but was unable to prove an act of violence by the *Edgar Pleitez* in furtherance of the MS-13 conspiracy).  Judge Saylor gave homeboy and defendant *Pleitez* 60 months.  *Id.* at #2591.  We can see therefore how Duggins' sentence rises and falls upon the government's leadership enhancement.  As a result…….

NOW COMES the Defendant, Djavier Duggins, and requests this Court at sentencing to: 1) apply a base offense level of "19" for his  crime of engaging in a conspiracy to violate 18 U.S.C. § 1962(d) – enterprise affairs through a pattern of racketeering activity; 2) reject the government's contention that he should get a leadership enhancement (or any other separate enhancement) atop his base offense level; 3) appreciate that this leadership enhancement serves as the government's *core* argument for attempting to treat Duggins as Castro was treated; and 4) reject this "Castro treatment" – which has "conspiracy to commit murder" serving as the main entrée on Duggins' relevant conduct platter, and as some sort of default stratagem, since they cannot prove that he himself is a murderous individual.

## ARGUMENT

## I.

### Duggins Is a Far Cry From The Leader of the Entire East Coast Program.

At the outset Duggins goes straight to point "4" stated above, and responds against it by giving the Court his *core* argument, stating that he is a far cry from *Jose Adan Martinez Castro*. Still, Duggins cannot deny that he was a member of *Sykos,* also conceding that he was active in his youth – between 2006 and 2012 to be exact. *See PSR* at ¶¶ 170-173 (outlining Duggins' time line of involvement with the criminal justice system as a member, but none thereafter). Duggins not only concedes this, but further acknowledges that since he did not "legally" withdraw from the enterprise, he still owes the government a debt for his RICO violation. *United States v. Leoner-Aguirre*, 939 F.3d 310, 318 (1st Cir. 2019) ("The law is clear that 'a defendant's membership in the ongoing unlawful scheme continues until he withdraws'") (citation omitted).

However, and as far as all of this leadership business is concerned, via the government's argument that Duggins led his clique as Castro has led the East Coast Program?  There is no evidentiary parallel to justify the government's requested analogous sentence.  Djavier Duggins has not done as Castro has done – conducting *Sykos* meetings and directing lower-level members to commit violence.  In fact, the present group known as *Sykos* seemed to have no problem in committing violence without any direction from him. *See PSR* at ¶117.  This is the most significant evidence on the point – meaning Duggins engaged in NO direction or management over *Sykos* when they required it the most, during the machete-styled execution of Herson Rivas. As a result, Duggins is not *Jose Adan Martinez Castro*, and has never been, as he led no one and conspired to kill no one, and thus he should get the "Santos-Gomez" treatment – a base offense level 19 and without the "Castro" motivated enhancements.  To put it as plainly as he can,

Duggins has not conspired with the cast of characters presently known as *Sykos*. However, and if the Court finds as "material" the issue of whether he did, and thus calling for an evidentiary hearing to resolve it, he hearkens back to his "reservation of rights" to seek a continuance, as he would believe that some post-conviction discovery practice may be necessary.[1]

## II.

### The Relevant Historical Background of Duggins' Role Within the *Sykos* Clique – It Ends Long Before Herson Rivas is Killed, And So Therefore Any Imminent Sentence He Receives Must Reject Any Present Day Leadership Enhancement

To begin, Duggins thinks it helpful to further explain his origins and obvious guilt with *Sykos*. Indisputably, Mr. Djavier Duggins is GUILTY of participating in the affairs of a criminal enterprise – the *Sykos* clique of MS-13 – and it all began in 2006. We can refer to the PSR for guidance on this point.

> "Lopez described the history of the Sykos clique. . . back in 2006
> . . .  around that time, Lopez and Duggins took over the clique,
> [and thereafter] . . . [a]ny son of a bitch from Lynn can tell you
> who the four of us are.  We are ***Deliquente*** [Elder Palma], ***Shadow***
> [Kevin Avelar], ***Haze*** [Djavier Duggins], and me [Erick Lopez or
> ***Mayimbu***]. . .The four of us."

*See PSR* at ¶ 43.

When perusing the PSR in its' totality, a helpful truth reveals the same PSR being devoid of any acts of 1st degree murder involving the *Sykos* clique during these infancy years.  However, and when examining the clique's "teenage" years, we have seen it take on a more murderous trajectory, beginning at the moment this cast of characters have changed from the original four,

---

[1] At the defendants' motion to continue the sentencing hearing, the undersigned put on the record that he wouldn't need additional time to prepare for a "typical" sentencing hearing in federal court, one where the parties argue their respective positions on the papers.  However, and in the "atypical" situation, where the Court perceives that live testimony from cooperators would be necessary, he asked for time to prepare for the same.  Duggins reminds this Court about how certain cooperators may have engaged in conduct which demonstrates a dual allegiance to the government as well as "Sykos" – the clique for which all relevant parties presumed they have abandoned, so that these cooperators could begin their new enterprise with the government.  There is more to this story, and Duggins may seek to obtain the jail calls of the cooperators to assist with illuminating the narrative, should there be a necessity to hear from cooperators.

and after certain imports from El Salvador were inaugurated.  That said, what cannot be ignored

is that Duggins has appeared to go against the grain of said trajectory – see another helpful fact:

> "Based on witness statements and other evidence, Lopez and
> Duggins remained as the two leaders of the Sykos clique,
> during the period between 2016 and 2018. . . Duggins was
> viewed as the First Word of the clique although Lopez, as
> the Second Word was described as the day-to-day supervisor
> and **leader**, of the younger gang members.  At least one witness
> described how MS-13 leaders in El Salvador wanted to ***replace***
> ***Duggins with Lopez as the First Word of the clique because they***
> ***were not happy with how Duggins was leading the clique*.**

*Id.* at ¶ 75. (emphasis added).

Mr. Duggins highlights these two points to demonstrate who he "was" in the early years of the

*Sykos* clique, and who he "is" more recently – a very important divide between how Duggins

should be perceived by this Court at sentencing.  To be sure, Duggins has pled guilty to the one-

count superseding indictment because: 1) he cannot dispute that he was a member of what

appeared to be a "four-man" clique in 2006. *Id. at ¶* 43; and 2) in 2012, he pled guilty to assault

charges in state court where he attacked a man in the aftermath shooting of one of his fellow

clique members, believing that this person was the perpetrator.  *Id. at ¶¶* 52-54; and 3) during

this period of time (2006-2012) he was given so-called "leadership" status (*Id. at ¶*43), albeit

without much evidentiary support as to what specific crimes of violence he either directed,

managed, or supervised; and 4) suggesting that he didn't even meet the legal definition of a

leader for purposes of U.S.S.G §3B1.1.  Therefore, Duggins' plea of guilty to racketeering

stemmed from his involvement with *Sykos* based upon points "1" and "2" above, along with the

understanding that this Court will decide points "3" and "4" at sentencing – whether the so-

called title which has been attached to him (between 2006 and 2012 and beyond) actually

warrants the enhancement.  For starters, there can be no way that Duggins' imminent sentence

should consider any leadership allegation, and particularly beyond 2012.[2]

**A. Duggins' imminent sentence from his guilty plea should not derive from any leadership allegations in more current years, an era which the government will argue establishes some working "agreement" with the people who killed Herson Rivas.**

As known, Duggins' last specific violent crime while being a member of the SLS clique was in 2012, where he was sentenced to 4.5 years in state prison. *Id. at* ¶ 173. Now, and moving forward to 2022, approaching a decade later after that crime, Duggins must fend off the government's theory that his previous title of leadership has more present-day applications – which would surely serve to aggravate any sentence. In so doing, Mr. Duggins merely responds as follows: 1) once he got out of jail in 2016, if anybody still considered him as the "first-word" (and particularly younger members), it was only due to Erick Lopez's exaltation of Duggins' intelligence and seniority status, as well as the credibility that *Sykos* could presently receive from it; *id.* at ¶¶ 43 and 46; 2) the overarching enterprise of MS-13 (in El Salvador) did not want any parts of Duggins leading this new and especially violent clique, rather opting for Erick Lopez to be its leader; *id.* at ¶ 75; and ultimately suggesting that; 3) Mr. Djavier Duggins, albeit still a member of MS-13 (as are his unindicted co-conspirators – "Shadow" and "Deliquente" – who also joined in 2006) did not share in any *agreement* with these new younger members, to commit the racketeering act of murder of any rivals or cooperators. To be sure, the issue of the day is the extent of Duggins' involvement with *Sykos* once these new members came into the fold, and not what he has already admitted – that he was involved with *Sykos* beforehand.

**B. Duggins' conduct with the *Sykos* clique before he was convicted in 2012 is not relevant conduct in this case. Rather, what is only relevant is the "agreement" which Duggins had with the Rivas murderers after his 2012 conviction, which the government has not proven.**

---

[2] Also, and for reasons suggested *infra*, his sentence also should not consider any leadership allegation **before** 2012 either. While the evidence will suggest that he may have been given the title, he still did not engage in activity amounting to an "exercise of decision-making authority" under U.S.S.G. §. 3B1.1, even assuming this title was affixed to him. He holds the government to its' proof should they argue otherwise.

Point number "3" in the previous section – that "Duggins did not share in the agreement to kill as *Sykos* has recently killed", actually becomes the ultimate announcement in support of mitigation, and where this court has direct evidence for its' exculpatory broadcast – the murder of Herson Rivas.   This murder was an act which happened *long after* Duggins paid his debt to state authorities back in 2012, where his state crime is no longer considered (by probation) as relevant conduct towards enhancing his base-offense level.  *Id.* at ¶168.  As a result, and to determine Duggins' relevant conduct for purposes of this federal sentencing, we must look to more recent actions committed by him during *Sykos'* path of resurgence, which has pinnacled with the death of Herson Rivas.   This death was the end of *Sykos'* racketeering path, with the ensuing arrests shining the light upon this juvenile-inspired enterprise, and exposing their murderous conspiracy to its' core.  To be sure however, their conspiracy was one which excluded Mr. Djavier Duggins.  Why exactly was Duggins excluded?  Is it because we know that such a heinous crime was committed right underneath his nose, and which perhaps also serves as the storyline for why El Salvador wanted nothing more to do with him?  The answer to this subplot is not required.  All we need to know is that there was an ***agreement*** among six individuals to kill a seventh member of the *Sykos* clique and Duggins was not included in the ***agreement***.  This fact is the most important of them all, and the government should not be able to argue their way out of it with theoretical or incompetent information.

To state it in more complete terms (if possible) would be that since Duggins was excluded from the knowledge and/or the participation in the killing of a clique member – perhaps the most significant and momentous crime a clique could perform, this exclusion just can't be dismissed as insignificant.  Rather his exclusion is the best evidence we have of his lack of status and "agreement" with the clique, and therefore should serve as a stark mitigating circumstance

regarding his imminent sentence.   The government must come to terms with this argument.  For until the government can explain through *evidence* how Duggins could be considered the present leader of "*Sykos*", but can also explain why he was ignored when it came time for the clique to commit this colossal racketeering act, Duggins submits that he cannot be the recipient of this present title.   Without it, the government will be unable to prove that he specifically conspired (and therefore agreed) with this newer version of the clique to commit 1st degree murder, and they cannot cure this inability by relying upon *theoretical arguments* which immediately make no sense when compared to the otherwise counter-evidence within this case.[3]

   *(i)*      ***The government should not rely upon pure theory to prove any recent agreement.***

      A reminder to the government when they endeavor the explanation for the "Rivas conundrum", is that they should reside less within the orbit of "theory", and moreso within the sphere of "evidence".   A more explicit reminder to them would be that as far as the *evidence* is concerned in this case, it is without question that the murder of Herson Rivas was not some impromptu or spontaneous crime against a rival gang member, for which a group could claim "no time to get permission from its' true leader".   *See PSR* at ¶ 67 (CW-19 reports that this crime was planned for at least two days leading up to the murder).   Rather, and based upon the reporting of CW-19, the *Sykos* clique's desire to kill one of their own was a planned and therefore pre-meditated attack, where all such planning just happened to skip the ears of the clique's most senior and so-called most respected member.   The government's excuse for how

---

[3] As a preview, Duggins perceives the government's *theoretical argument* as follows: "Mr. Duggins may not have agreed to kill Herson Rivas, but since he 'was and is' the present **leader** of this newly murderous band of characters named "*Sykos*", then of course he must have shared with and therefore conspired in an agreement with them, that one or more members would commit murder".   Sounds like the "Castro treatment" for being a **leader**.   The problem with this theoretical proposition is that it fails to address why Duggins didn't lead when it mattered the most – killing a clique member.   We can see therefore how important this present leadership controversy will reside at the heart of his sentencing hearing, and Duggins therefore holds the government to its' proof.

this could be?  Lopez as "second-word" can also order the attack.  *Id. at* ¶ 117.

### (ii)  Can second-words order such a monumental racketeering act?

Duggins has heard the government's purely theoretical response as to how Rivas could be

murdered this way – that Lopez as "second-word" could trump the chain of command when it

comes to killing its' own members.  *See id. at* ¶ 117 (CW-24 and CW-27 both allege that since

Lopez "their other leader" (whatever that means) was present, then Duggins' permission was not

needed).  This excuse/theory is not good enough.  *See United States v. Perez-Vasquez*, 6 F. 4th

180, 187 (1st Cir. 2021) (Court adopts the government's narrative that "MS-13 associates ***are not***

***permitted to kill other MS-13 associates*** unless leadership, usually in El Salvador puts a 'green

light' on the individual") (emphasis added).  The point is that such a serious crime just cannot be

ordered by anybody, and therefore performed at-will within the MS-13 constitution.  Rather,

"leadership" must be consulted.  *Perez-Vasquez*, at 187.  Duggins fails to see any provision

within MS-13's own constitution which vests authority into the gavel of "second-word" Erick

Lopez, so he himself can green-light the killing of an MS-13 associate, and do so without neither

El Salvador or the supposed "first-word" of the clique being first consulted.  Second-words are a

subordinate position, and the government cannot interchange the two to suit their narrative.

Duggins merely relies upon the nomenclature of a "second-word", to argue that it

necessarily plays a subordinate role under "first-word" status.  If it doesn't necessarily work this

way within the MS-13 handbook, then the government should have no problem producing to this

court one case in MS-13 history which allows a "second-word" to orchestrate a plan in killing a

member of a clique, while a first-word is otherwise occupied pursuing a career path.  He hopes

they don't cite to *Perez-Vasquez*. *Id. at* 188 (second-word of the Everett clique, who took over

for an incarcerated first-word, thereafter planned (after first getting permission from El Salvador)

to murder a 16 year old associate, as the second-word believed the associate cooperated with law enforcement to incarcerate the first-word).   This event actually proves Duggins' point.  First of all, the second-word in *Perez-Vasquez* was not acting as "second-in- command" but "first-in-command", since the true first-word was incapacitated via a jail cell.  *Id.*  Secondly and moreover, the second-word only acted in this higher capacity after getting a "green-light" from even higher leadership – El Salvador.  *Id.*

In Duggins' fact-pattern however we see the total opposite.  Duggins was not in jail at the time of the Rivas murder and El Salvador was not consulted.  The point is that if we accept the government's narrative on how things worked in *Perez-Vasquez*¸ we must see the contradiction here – with the so called first-word of *Sykos* (Duggins) being available to rule, but appearing more interested not in "killing a member" but "punching a clock" – trying to support a family. *Id. at ¶* 218 (At the time of the Rivas murder, Duggins had a full time job at "Select Valet Parking" making $18.00 an hour).  The government can't have it both ways.  Either Duggins was available to lead, and *Sykos* expecting the same before a member of his clique was murdered, or he wasn't the leader under the same analysis.  In other words, either Mr. Djavier Duggins was the most senior, the most respected, the most intelligent, and the "number 1" as Erick Lopez describes him in 2015 (*see id.* at ¶ 46) and where the government assumes him as the top "general"  of *Sykos* in 2018, or, something changed between 2015 and 2018.   Let us not forget that Duggins was actually incapacitated (in jail) himself in 2015 (*id.* at ¶173), and thus Erick Lopez could only be in wishful-thinking mode of Duggins assuming future leadership responsibilities when he is "spreading the news" to other MS-13 operatives.  To be sure, let's see exactly what Mr. Lopez said about Duggins while he was still in jail back in 2015.

> "The only one that I respect like that is HAZE. From the day I
>  jumped in dude, to this very day, HAZE has always been the **number**

**one**.  Do you know why? Because when you think you are one step ahead of that dude, he is three steps ahead of you!".

*See PSR* at ¶ 46. (emphasis added).

Fast-forward to Duggins' release, and then 3 years later after these statements by Lopez, if Duggins was really their "number 1" in 2018, and the smartest guy in the room, why does the clique go "under his head" and take direction from Erick Lopez?   Furthermore, what took place here is not even fathomable if Duggins was really their general/commanding officer – where a colonel (Erick Lopez) can plan the ultimate and most severe of a court-martial, by imposing the death penalty of one of his soldiers' but without getting permission from the "general" or even higher up in the chain of command, the "joint chiefs of staff" – namely El Salvador.  It's all just upside down and the government just can't spin it up-right, except perhaps to come up with the excuse that the clique just went "rogue" while Duggins' was at the helm.  Not good enough.

*(iii)* ***The government may also try to persuade this Court that Djavier Duggins just happened to be leading a "rogue" clique, which had gone off the reservation, doing what they wanted and when they wanted.  The argument doesn't work on the question of leadership status, let alone his "agreement".***

The government may offer this court an additional theorem in explaining the leadership conundrum, simply by dismissing the importance of the Rivas murder, claiming: "oh, let's just chalk up the crime to some isolated event where the clique went 'rogue' over the course of two days, and during this period of lapse, a pre-meditated a machete-styled execution of Rivas at a park in Lynn just happens to takes place".  Not good enough.  Because whether this clique went rogue or not, what remains constant in the analysis is that Duggins was not part of the mutiny, putting in doubt the nature of any "agreement" which he had with *Sykos*.  As such, and if this Court has any reason to doubt that such a pre-meditated plan would skip the ears of a true leader of such an organization, then this Court must also hold in doubt Duggins' true role within this

more recent model of the *Sykos* installation.  In any event, his role cannot be one of either the direction, management over, and/or supervision of the same.

Finally, and where the evidence between 2015 and 2018 demonstrates a void of Duggins' management over *Sykos*, even if we assume that he was some sort of "leader" back in 2012, the only conclusion we can draw is that at some point in time thereafter was a changing of the guard.  *Id.* at ¶ 75 (one MS-13 operative reports that El Salvador wanted Duggins' replaced).  This changing of the guard can only mean one thing – that at the time of the Rivas murder, the government has affixed the wrong titles to the wrong people.  Duggins' alleged leadership status should therefore be discounted by this Court, and once it does, we see that at best he is just a member – just like "Shadow" and "Delicuente" – unindicted and base offense level co-conspirators, both who will most likely never see the inside of a jail cell, at least on this indictment.

Duggins recognizes that he has begun his sentencing memo with loquacious vigor on the issue of his leadership, and probably to the point of *ad nauseum* by referencing the Rivas murder in perpetuity.   However, there is potentially 20 years on the line, and so Duggins must be zealous in his advocacy.  This Court's appreciation of Duggins' counter-arguments on leadership is vital – so as to set the stage for why he must be sentenced as a member of MS-13 and nothing more.  Dismantling all of this "first-word" business therefore becomes critical to his argument, and before this Court can move forward with the crafting of any fair and just sentence for Duggins.  There is still much more to say about it all, but the actual relevant conduct alleged in the PSR also needs sufficient attention, and so Duggins must move forward.

### III.

**Moving Forward to Sentencing By Analyzing Duggins' Relevant Conduct which includes: His Aging-Out of Ganglife, Enhancements Alleged in the PSR, A Separate Government Inspired Conspiracy to Commit Murder Enhancement, The Salvador Gutierrez Recording, and Other Leadership Considerations.**

**A.   Introduction**

After review of Duggins' PSR, probation has concluded by a preponderance, that for guideline purposes the evidence supports the conclusion that Duggins is accountable for two separate crimes:

1.  Conspiracy to Murder Blanca Lainez in June of 2016.

2.  Accessory after the fact to the July 2018 Murder of Herson Rivas

*See* ¶¶ 68-62; and 109-110.  *See also* ¶¶ 149-60.

Probation calculated Duggins' combined adjusted offense level at "47", with a Criminal History Category "V", which places the advisory guideline range above the 20 year statutory maximum of 18 U.S.C. § 1961(d).  *Id.* at ¶164 and 230.  Duggins objected to probation's calculation of the offense level, and has requested a downward departure under U.S.S.G. § 4A1.3 – as his criminal history category of "V" substantially over-represents the seriousness of his criminal history, or the likelihood that he will commit other crimes.  However and even if this Court disagrees with Duggins' departure argument, he remains steadfast upon his objection that the correct advisory guideline range is "19", with a sentence range of 41 to 51 months.  This "19" derives from his long-term tenure within the MS-13 enterprise, but cannot go any higher. The reason being and for starters, it's because we see strong evidence that he has "aged-out" of the violence.

**B.  Duggins long-term tenure with MS-13 began when he was just a teenager, but his tenure also provides evidence of his "aging-out".**

Although Duggins' perceived guideline range is 41 to 51 months, if this Court were to give Duggins a sentence in excess of that – let's say 66 months – he would have given 10 years (in total) of his life to the criminal justice system, and simply because of the poor decisions which he made at the age of 16 or 17 years old.   Yes, Duggins joined the *Sykos* clique chapter of MS-13 in 2006 and while he was only a junior in high school.  *See PSR* at ¶ 216. That youthful decision resulted in the extraction of his person from the community for almost 5 years, where it is *without dispute* that he engaged in an attack of a person, in the immediate aftermath of a fellow clique member being shot.  *Id.* at ¶¶ 52-54.  To be sure, that conduct (now some 10 years ago) is not "relevant" – as it is far too dated – at least by probation's opinion.  *Id.* at ¶ 168.  Now, and since Duggins had paid that first debt to our Commonwealth, it is also *without dispute* that he has exhibited major strides in being a productive and responsible member of society – providing a strong inference that he has "aged-out".  *Id.* at ¶¶ 199-202*; 218-222.* The strength of this inference comes from his "other relevant conduct" which the government has no interest in highlighting – his living and working peacefully within our community for going on 3 years since his release from state custody.  *Id.*  Furthermore, this commendable attitude of "aging-out", so that he could become the man which society could hold in respectable regard, *seems to be a bit contagious*.  See an example of how this all works below.

CW-13:          ". . .  Why did MAYIMBU get second Word?"

SALVADOR:     "Because DELINCUENTE gave it to him.  DELICUTENTE had
                      Second and DELICUENTE gave it to him, dude."

CW-13:          "Why didn't SHADOW get it?"

SALVADOR:     "Because SHADOW, fuck, he has a lot of kids.  He has like twin
                      girls, and he has a son, about two years old. He has about four

children just with the woman he's with now.  . ."

*Page 14 of the Salvador Gutierrez transcript jail recording of October 24, 2018.*

As Mr. Salvador Guiterrez ("Salvador") and CW-13 are yakking away back in 2018, we see Salvador is talking about very senior members involved with the *Sykos* clique – as Lopez [Mayimbu] had previously called them all – the "four of us". *Id. at* ¶43.   To be sure, all of them appear to be known by Salvador – and so much so that he is explaining why "SHADOW" has too many responsibilities (mouths to feed), to take on any subordinate leadership position with the clique.   Duggins reserves the right to call his employer, and the mother of the 3 children whom he was taking care of, to claim the same exemption.

Duggins' claim of exemption aside, we know it doesn't serve as a free and complete pass. This is because we are now in the year 2022 – some 16 years after Duggins first joined *Sykos,* and he is still not finished with his debt.  This is a primary consequence of, and as the PSR has alleged, "MS-13" is for life".  *See PSR* at ¶ 33.  However, Duggins takes exception to any notion that people can't "age-out" of gang-life, and has taken great pains to highlight this finer point. More importantly, he fine tunes it so as to stifle the government's words from conveying the repeated mantra – the one which Duggins hears now over and over in his head – and it's simply "just give him the *Castro* treatment".  However, and as seen above, the evidence of Duggins' "aging-out" actually serves to distinguish himself from this senior representative.   Additionally, but not only has Duggins distinguished himself from Castro's behavior, he has also distinguished himself from the behavior of *Sykos* as well – which further serves as additional evidence of him "aging-out".

     ***(i)*** ***Upon review of the general and daily activities of*** Sykos¸ *we see that Duggins did not behave as* Sykos *has behaved, side-stepping all of the mindless activities which* Sykos *loved to do to pass the time – which serves as additional evidence that he has "aged-out".*

The PSR has demonstrated a stark contrast between Duggins' daily behavior and the daily behavior of *Sykos.* See below:

> "In the months leading up to the July 2018 murder of Rivas, Lopez frequently hung out with Salvador, Vaquerano, Tercero, and other members of the *Sykos* clique, serving as their mentor, leader, and/or provider . . . it appears that [ ] Lopez had received a significant financial settlement. . . also us[ing] the money [ ] to pay for transportation, lodging, and food for his clique members.  Evidence showed that that the group rented hotel rooms where the *Sykos* clique members would hang out, smoke marijuana, play video games, and discuss gang activity.  The group also used to watch MS-13 recruitment or promotional videos to pump themselves up about MS-13 activities, listened to MS-13 rap songs, and discussed activities in furtherance of MS-13's mission.

*See PSR* at ¶¶ 88-89.

The above information (and supplied to probation by the government) is extremely important in helping this Court understand the contradiction painted by the PSR in portraying Duggins as a *leader*, or even just an active *operative* beyond membership, and during more recent years.  First, we can derive from the language above that the collective unit of *Sykos* appeared to have Erick Lopez as their provider and caretaker – said unit comprising of these very young and fresh members.  Lopez's care-giving appears to have gone on for an extended period time, as they all hotel-hopped, engaging in the mindless activities that teenagers often do while high on marijuana.  Of note is that Duggins does not appear to share in the frolic.  The reason being?  He is otherwise preoccupied with activities far from being mindless – sweating over full-time work weeks so he can provide for his family.  *Id. at* ¶¶ 200, 202, and 218. In sum, Duggins' behavior in contrast with his co-defendants also appears to bolster his claim of "aging-out".

C. **The enhancements alleged in the PSR – the guidelines of course should be driven by Duggins' relevant conduct, but the relevant conduct alleged against him in the PSR cannot be proven by the government.**

To ascertain Duggins' responsibility for the activities set forth in his PSR, courts look to the doctrine of relevant conduct described in U.S.S.G. § 1B1.3. In cases of jointly undertaken criminal activity, the guidelines include as relevant conduct all (1) reasonably foreseeable acts and omissions of others that were (2) in furtherance of (3) the jointly undertaken activity. *id; See also United States v. Patriarca,* 912 F. Supp. 596 (D. Mass. 1995) (Wolf, J) (whether the **proffered acts** (as relevant conduct) were reasonably foreseeable and in furtherance of jointly undertaken criminal activity which Duggins "explicitly or implicitly **agreed** to. . . with others") (emphasis added). These determinations will fix the relevant conduct under § 1B1.3 for purposes of calculating the offense level. *Id.* Such determinations are, of course, all "inherently fact-bound". *Id.*

Although these elements closely mirror the requirements for conspiracy liability, the guidelines conceive the concept a little differently when assessing a defendant's relevant conduct. A review of the commentary to the guidelines show that while the emphasis in substantive conspiracy liability is the scope of the entire conspiracy, and foreseeability in light of that scope, the emphasis under § 1B1.3 is the scope of the individuals undertaking, and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole. *Id.* The court must therefore make an individual assessment of the Defendant's **role** in the undertaking and not simply impute the entire activity by members of the enterprise upon the Defendant. *See application note 2 in relevant part*:

> ". . the scope of the activity jointly undertaken by the defendant is not necessarily the same as the scope of the entire conspiracy, and ***hence relevant conduct is not the same for every participant.*** Conduct of others that was not in furtherance of criminal activity jointly undertaken

by the defendant or was not reasonably foreseeable in connection with
that criminal activity is not relevant conduct under this provision".

(emphasis added).

As such, Duggins merely asks this Court to assess whether probation's claims as stated in
section "III.A" above, or their "***proffered acts***", that: 1) Duggins "green-lighting" the murder of
Blanca Lainez in June of 2016; and 2) Duggins' "checking for cameras" after the murder of
Herson Rivas: (a) even happened; and (b) even if it did, amounts to "relevant conduct" under the
guidelines.

### (i)  The murder of Blanca Lainez – paragraphs 59-62.

First, Duggins challenges whether this even happened – not the murder of Lainez, but
whether he had anything to do with it.  This claim of his involvement has come from cooperators
(CW-24 and CW-27), and for these people to be credited by the Court, Duggins would seek an
evidentiary hearing.  However, and thereafter if this Court even believes that Duggins ordered
the murder (which Duggins vehemently opposes) he still maintains that this alleged murder was
not in furtherance of the MS-13 enterprise.  This would of course dispense with any need for an
evidentiary hearing on this issue.  To be sure, and the government has been quite consistent
about it from the beginning, but MS-13 seems to be about two things – killing gang-rivals and
cooperators.  *See First Superseding Indictment.*  Upon review of the PSR however, we see no
claim that "Blanca Lainez" was either a gang-rival or some cooperator.  She was merely the ex-
girlfriend of a *Sykos* clique member (Jose Hernandez) and left him to date a rival gang-member,
alongside some theory (without evidentiary support) that she was "*somehow* trying to set him
up".  *See PSR* at ¶ 62.

From where Duggins' stands, this all sounds like some personal scorn on behalf of
Hernandez, and whatever he allegedly did to his ex-girlfriend to express that scorn, would

therefore not be an affair of the enterprise.  *See e.g., United States v. D'Angelo*, No. 02 Cr. 299

(JG) 2004 WL 315237 (E.D.N.Y. Feb. 18, 2004) (Murder of a rival gang member was not related

to the enterprise where "[t]he dispute that led to the [victim's] death . . . started over a woman");

*United States v. Banks*, 514, F. 3d 959, 968 (9th Cir. 2008) (holding that rival gang member

murdered cannot serve as sufficient proof on VICAR count where the crime was motivated by

personal animosity and by a desire to regain the respect and affection of his girlfriend); *United*

*States v. Bruno,* 383 F. 3d 65, 85 (2nd Cir. 2004) (court held that murder committed to avoid

paying loan-sharking debts, and out of animosity towards victim were simply personal matters,

and bore no nexus to the activities of the organized crime family); *See also United States v.*

*Jannotti¸* 729 F. 2d 213, 232-33 (3rd Cir. 1984) (Although a member of the charged enterprise

"played a key role in inducing [Defendant] to accept [a] bribe", there was no relationship to the

enterprise because "the evidence demonstrates there was no relationship to the enterprise because

he was acting in in his personal capacity").[4]

### (ii) Accessory after the fact to Herson Rivas – paragraphs 109-110.

In these paragraphs, it is alleged that Mr. Duggins went to crime scene "after the fact" of

the Rivas murder, to check to see if there were cameras.  First, Duggins objects that he did, and

holds the government to its' proof.   However, and just like the Lainez murder, this "fact"

---

[4] It would appear that other district courts have also followed this train of thought. *United States v. Jones,* 291 F. Supp. 2d 78 (D. Conn. 2003) (Court rejected "[t]he argument that any personal act of disrespect toward [the defendant] was tantamount to an act of disrespect against the [e]nterprise," because that theory "blurs the distinction between violent crimes that are committed in connection with a criminal enterprise's affairs and those that arise from purely non-enterprise-related matters). *See also United States v. Hunter,* No. 5 Cr. 188, 2018 WL 268065, at *8 (E.D.N.Y. 2008), *aff'd,* 388 F. App'x 1 (2d Cir. 2010) ("I [] reject the government's argument that [the victim's] disrespect for [a gang member] (by sleeping with his girlfriend) damaged the reputation of the enterprise, thus leading [other gang members] to defend the enterprise against the `threat' posed by this affair."); *United States v. Barbeito,* No. 2:09 Cr. 00222, 2010 WL 2243878, at *19 (S.D. W. Va. 2010) ("[C]ourts have rejected unsupported inferences, proffered by the Government, that acts of violence by a member of a racketeering enterprise committed for ostensibly personal reasons were motivated by a desire to increase the member's position.").

objection may not need judicial resolution.  This is because, and even assuming the truth of the

allegation, Duggins submits that this conduct is not sufficient to meet the legal definition of

accessory after the fact.  *See* 18 U.S.C. § 3 ("Whoever, knowing that an offense against the

United States has been committed, receives, relieves, comforts or assists the offender ***in order to***

***hinder or prevent his apprehension***, *trial, or punishment*, is an accessory after the fact")

(emphasis added).  Duggins submits that merely checking a crime scene for the existence of

cameras, and without more, does nothing to hinder or prevent anything – and in particular the

apprehension of suspects, nor hinder their punishment.  The PSR must come to terms with the

fact of what "checking for cameras" does in the world of criminal liability – which is nothing.

For example and if tomorrow, a family member committed a crime, and the undersigned

went to the crime scene and found cameras and thereafter destroyed them, that action would

certainly amount to some assistance – done to *hinder or prevent* apprehension, *destroy* the

evidence at trial, or serve to *neutralize* punishment.  Seeing a camera (or not) however, and then

going back home assists no one.  Even if the principle is told of the existence of cameras, what

can be done at that point?  It's like calling up the FBI and asking them if they got a confession of

one of their friends on tape.  If so it only confirms the obvious – the confessor/friend is in

trouble.  Mr. Duggins therefore not only objects to the fact claim of him being an accessory, but

also objects (assuming the Court finds said facts as true) on the grounds that said facts don't

meet the legal definition of "accessory after the fact" and holds the government to their proof.

**D.  The governmental inspired alternative of "conspiracy to commit murder" to also serve as
Mr. Duggins' relevant conduct**

*(i)  Introduction – the government seeks a maximum sentence with minimum effort.*

Here, we are back again to the "Castro treatment".  For the government to diverge from

probation and seek this separate enhancement against Mr. Duggins, he assumes that the

government appreciates the evidentiary problems from which the PSR suffers – whether the

Lainez or Rivas murders can be served on Mr. Duggins' plate as relevant conduct.  This

assumption comes from the government's suggestion that it perceives an easier path to obtaining

the outcome of its' desire – a 20 year sentence for Mr. Duggins, but without having to call

cooperators to the stand to prove what Duggins denies – that he greenlights high school girls,

and/or inspects crime scenes for cameras to no benefit.  For more help on this assumption, let's

review the government's first objection lodged to the PSR:

> The government submits that Duggins should get a separate
> grouping under U.S.S.G. § 2A1.5 for "conspiracy or solicitation
> to murder."  The application of this guideline would serve 2
> important purposes: (i) it would appropriately hold Duggins
> responsible for conspiring with others and soliciting others
> to commit murder during his lengthy tenure as an MS-13
> member, and (ii) it would eliminate the need for the Court
> to rule on numerous objections by Duggins and would relatedly
> obviate any need for an evidentiary hearing on those **tangential
> issues**.  Once the Court applies this guideline—which is supported
> by the evidence in this case—it would also obviate the need for the
> Court to determine whether additional groups for murder or accessory
> after the fact to murder should apply, because this conspiracy or
> solicitation to murder guideline itself will take Duggins to the
> statutory maximum sentence of 20 years.

*See governmental objection #1 to the draft PSR prepared by probation* (emphasis added).

This governmental objection tells us what is most important to them at the end of the day

– 20 years.  How they get to that final destination seems to be an operation of mere efficiency

over anything else – believing that "conspiracy to murder" achieves maximum productivity

without much effort – because no evidentiary hearing is required.  This is fine.  To be sure,

Duggins himself also does not beseech this Court for an evidentiary hearing.   Just like the

government, he contends that if the government wants to try and prove "on the papers" that he

conspired with *Sykos*, then he would bellow in response the "Rivas murder", and sees where the

Court will come out.  However, and if the government believes that probation's assessment of

Duggins' relevant conduct (the Lainez and Rivas murders) should serve as a fail-safe, then

Duggins does not see how this back-up strategy wouldn't call for an evidentiary hearing on what

the government has called "tangential issues".  *Id.*

However, and on the government's claim that since he was a leader of *Sykos*, he therefore

conspired with them to commit murder?  This is another "proffered act" upon which the

government seeks that Duggins would be held accountable, but this Court has already held that

his accountability under the guidelines is **"*significantly narrower*"** than the conduct embraced

by the law of conspiracy.  See additional language from this court for further emphasis:

> "The operation of *Pinkerton* standards in the determination of
> relevant conduct means that "`the scope of [relevant] conduct for
> which a defendant can be held accountable under the sentencing
> guidelines is ***significantly narrower*** than the conduct embraced by
> the law of conspiracy ...'". . .This is true because "[t]he broader
> aspect of conspiracy law, permitting conviction of a defendant who
> knew some but not all the aims of the conspiracy applies only to
> conviction for the conspiracy offense itself, and not to vicarious
> liability for substantive offenses committed by a co-conspirator."

*Patriarca* at 605. (emphasis added) (citations omitted).

Here, the government of course is aware of the above language, which applies a

narrowly-held distinction when it comes to the relevant conduct doctrine, but still wants a

broader application.  For in essence, they are claiming that since Duggins pled guilty to a

"conspiracy" to violate RICO, and where the enterprise "conspires" to commit and does commit

murder, even though Duggins is not vicariously liable for the particular murder, he is still liable

for the "agreement" because that is what MS-13 is all about.   In essence, they will probably

argue that it matters not whether he knew about the Rivas murder, for "this is what he signed up

for" by joining *Sykos*.  However, and at this point are we speaking about the scope of the "entire

conspiracy" under general conspiracy law, or, the scope of the individual defendant's undertaking?  Based upon this Court's decision in *Patriarca,* the government knows that it is the latter, which is why it is imperative for them to prove their leadership enhancement.

So, and if this is the path upon which the government seeks to travel – proving leadership and therefore conspiracy to commit murder "on the papers"?  If so then Duggins would be fine arguing that "on the papers alone" the evidence doesn't suffice.  Duggins actually would be fine with a paper-record argument, even recognizing that the government will provide this court with one very critical document which they will declare will be more impactful than all the rest – the transcript of the Salvador Gutierrez  recording.  To be sure, it is without question that this transcript represents their entire case against Duggins.  This is to say, that as this Court embraces the Salvador recording, so does it embrace the strength of the government's case.  In fact it is that recording which serves as the only reason why Duggins is even charged with a crime in the first place.

> *(ii)*     ***The government's case on paper is all about the Salvador Gutierrez recording, and in fact, it is the only reason why Mr. Duggins has been charged with a crime.***

The litigation of this case spans approximately 3+ years, and the undersigned can remember (but without citation to the) numerous instances where he has alleged to the Court that Duggins has been hitched to an indictment which charges murder against five others, but where he did not participate.  What is also worthy of mention is that we also know that other senior members of the *Sykos* clique also failed to participate ("Shadow" and "Delicuente") but yet they don't find themselves indicted by the federal government like Mr. Duggins.  Of course, any objective legal scholar knows that Mr. Duggins' guilt as a RICO conspirator does not hinge upon the government proving overt acts which were NOT committed by himself.  *See Salinas v.*

*United States,* 522 U.S. 52, 63 (1997) (government need not prove defendant or co-conspirators committed overt act in furtherance of the conspiracy). As a result, we know that the government is not acting out of bounds within their indictment. However the question is still begged, why him? One fact provides illumination– the Salvador Guitterez recording.

Once the Salvador recording is reviewed, we can see two things: 1) Salvador speaks in gory detail about the Rivas murder; and 2) Duggins was "first-word" of the clique. With the government hearing just that, they needed to hear no more, and thereafter believed that Duggins must be held to account for governing over a clique at a time when Rivas was killed. They will also seek to bolster Duggins' accountability by relying upon other areas of the recording, which they believe provides sufficient evidence to prove that Duggins conspired with *Sykos* to commit murder. Upon closer inspection of this recording however, we don't really hear Duggins' "doing" much of anything – save a "camera-run", which Duggins has already established *supra*, is not an accessory after the fact. In actuality, when one reviews the recording in its' totality, we see that it provides only 2 more relevant pieces of information, both of which are outlined within about 3 paragraphs within the PSR. (*paragraphs* 83-85). Once we review them, and alongside the untruthful bluster and crowing exiting from the mouth of the same author, "Salvador", Duggins responds "not good enough".

### (iii) Paragraphs 83-85 – Duggins is supposedly recruiting and advising Salvador Gutierrez about murder. However, and just because Salvador speaks at all, means NOT that his statements are trustworthy. Duggins must be given an opportunity to impeach them.

In *paragraph 83*, Duggins is reported to have "recruited" Salvador into *Sykos*, because he heard about a murder committed by Salvador in 2016, and that Duggins was going to make him a "chequeo" based upon his prior violence, but Salvador refused. See the quote below from the Salvador recording below:

> "***HAZE was getting out right about that time, dude and VAGO and
> SHADOW***.[5]  I met them, and **they** asked me, "what's up, what did I
> think, dude?  I told them I would think about it and a few days later,
> Haze called me.  "What's going on?  What did you decide?  Yes dude.
> So I was with them a good while ago. Afterwards, I beat up a son of a
> bitch by Pollo Campero, and I stabbed him two times, dog, and he said
> to me, "Dude, we're making you Chequeo, I've also heard some things
> about you," he said to me.  "No", I said to him, "for me those things
> don't count".  That was with another clique" I told him like that.
> "Dog, over at the park at the airport, I killed that son of a bitch.  And
> he tells me "that was it dog".

Then, and in the next two paragraphs, the government contends that the Salvador recording

establishes that Duggins encouraged Salvador to commit murder.  See the following:

> ". . . Haze [Duggins] always told me, "Look when you go kill a son
> of a bitch dude, invite any other dude except Mayimbu [Lopez], dude
> I wouldn't go kill someone with Mayimbu [Lopez], he told me, even
> if they paid me!  The problem with Mayimbu [Lopez] is that he has
> a big mouth . . .".

Obviously, these two statements will serve as the government's *core* argument, that

Duggins was acting as a leader not only by his recruitment of Salvador, but also by his advice to

Salvador (in that same capacity) on who to kill and not to kill with.   Duggins obviously cannot

dispute that the statements were made by Salvador, but where is the proof that said statements

are (more likely than not) "true"?  We can see the following holding in *United States v. Shrader,*

56  F.3d 288, 294-95 (1st Cir. 1995) for some assistance on how the Court should view

statements such as these:

> "[W]e certainly concede that uncorroborated, or largely uncorroborated
> affidavits of cooperating co-conspirators should be viewed with some
> skepticism . . . [with] ensuring that defendants have a sufficient opportunity
> to impeach tenuous evidence in appropriate ways, such as through cross-
> examination or **by the introduction of evidence of their own**).

(emphasis added).

---

[5] For reasons unknown this first (and most important) sentence was left out of the draft PSR.

For starters, we know that Salvador Gutierrez will never be cross-examined.  However, and if Duggins can introduce *his own evidence* that Salvador has given overtly false information in other sections of his recording, would that not be the next best thing beyond impeaching his live testimony?  Duggins, and in lieu of impeaching Salvador Guiterrez on the stand, provides this Court with the next best thing – highlighting at least a couple of instances where the transcript exposes Salvador, and quite frankly, to be an outright liar. Duggins therefore endeavors to impeach.

**(a) Salvador lies and lies within his own statement to CW-13, and not about ancillary issues but about the Rivas murder itself.**

One area in particular where Salvador lies is actually the most germane to this case – the Rivas murder itself.  See below:

| | |
|---|---|
| CW-13: | "So, and the boy you guys killed at the park in Lynn, why did you kill him?" |
| PERVOSO: | "Because the guy was working with the cops, dog". |
| CW-13: | "And who figured that out" |
| PERVOSO: | [at the hotel] I had noticed what the guy's password was.  It was a "Z" . . . So the dudes starting punching him, saying . . . "Son of a bitch, give me your phone! . . . ***And the dude had recordings dude, talking to the cops***, dude.  And another phone of that girl had recordings. The girl had sent the audios on WhatsApp, and was telling dude. What was that son of a bitch's name. . . SMILEY UI. His name was Herson". |

*See page 16 of the Salvador Gutierrez transcript jail recording of October 24, 2018.*

To be very blunt about this – Salvador was outright LYING to CW-13 during this exchange.  As the government has confirmed, Herson Rivas had never cooperated with law enforcement, and surely there were no recordings – in phones or on WhatsApp revealing as much.  In essence Salvador told 2 lies: a) that Rivas was cooperating with the police; and b) he

had evidence (recordings) to prove it. *Id.*  At least there is one truth to be had from Salvador's words – they can't be trusted.  Salvador even lies on more minor facts as it pertains to the murder.  See the following:

> CW-13:        Were you all soaked in blood in broad daylight?
>
> PERVOSO:    Yes.
>
> CW-13:        You guys really don't give a fuck.
>
> PERVOSO:    Yes my shoes are white.
>
> CW-13:        And soaked in blood.
>
> PERVOSO:    Yes….
>
> CW-13:        . . . but when you went into the hotel?
>
> PERVOSO:    There were no cameras in the room.
>
> CW-13:        No but at the entrance.
>
> PERVOSO:    At the entrance, yes, I went in with MAYIMBU to pay for the hotel.
>
> CW-13:        You guys were soaked in blood.
>
> PERVOSO:    Right.
>
> CW-13:        You guys really don't give a fuck!

*See page 25 of the Salvador Gutierrez transcript jail recording of October 24, 2018.*

This exchange also exposes another lie.  The PSR reports that the hotel was booked "before" the murder.  *See PSR* at ¶¶ 95-96  (surveillance camera at the Knights Inn hotel capturing Lopez checking in and paying for the hotel room at 6:07 p.m., but the murder took place shortly after 8:00 p.m.)  As such, and after the murder, there would have been no reason for Salvador to go back to the main entrance soaked in blood to pay for a hotel.  There are surely no surveillance cameras indicating as much.  Instead, he most likely just went to his room, but

wanted to give the impression to CW-13, as he said – he just doesn't "give a fuck", which is also a lie.

The take-away from the Salvador's recording is that he is a story-teller.  But the Court still must address the operative sub-question, which is whether he is an "honest" one, or does he just like to puff and blow.  From review of just the 2 lies provided, this Court has a distinct impression that not only does Salvador likes to puff and blow, but also in a "dishonest" way. Furthermore, and if Duggins' name is tossed around within Salvador's sandstorm of story-telling, this Court is without the proper weathering mechanism to separate the fact and/or fiction within it.   As a result, this Court cannot rely upon the Salvador recording to the extent upon which the government would like, and certainly not as a sufficient basis to establish a guideline calculation for conspiracy to commit murder.  The reason for all this is simple – the statement is tainted with lies seen elsewhere within the same statement.

**(b) Even if this Court were to credit select portions of Salvador's statement, we still must analyze the statement for merit before we embrace his words.**

After review of the Gutierrez statement in its' totality, if the Court believes it can somehow pull out a ripe apple within a barrel of rotten ones – crediting only a sample of Salvador's statements when it pertains to Mr. Duggins, we must still analyze those statements for merit.  Moving back to the recruitment issue, assuming (and without conceding) that Salvador was speaking the truth on that point, we see that he met with 3 people on a random day: a) VAGO; b) SHADOW; and c) HAZE.  Then it was reported that "**they**" asked me what did I think?  There is nothing more which is specifically mentioned about the dialogue other than that. Next, Duggins is claimed to have a conversation with Salvador asking about his "decision". Again, nothing is mentioned about joining *Sykos*, and the government just assumes it.

Even if the government's assumption is true (or more likely than not true), one MS-13 member asking another MS-13 member about whether they will join a clique is not necessarily akin to recruitment. If Duggins was asking in the capacity of a "leader" of the organization, that may be something different, but this Court is well aware of Duggins' pages of objections challenging his leadership during this time – with the Rivas murder serving as the factual grounds for his objection. Therefore and even assuming this Court credits Salvador's "bluster" about Duggins supposedly asking him "what was his decision" in joining as a member, Duggins claims that the question standing alone, does not prove recruitment.

Additionally, and perusing more of the facts asserted within Salvador's statement, we see another claim by him that somebody ("he") wanted to make Salvador a chequeo, but yet Salvador never actually identifies who "he" is. The reasonable inference is that it could be "VAGO", or it could be "SHADOW", or it could be "HAZE", but there is no way to know which is more likely than not. Lastly, Duggins has received NO evidence from the government that there was a person *actually* stabbed over at Pollo Compero, and so therefore we have no corroboration to whether *anybody* would have reason to promote Salvador to chequeo or not on that basis. Again, did Salvador *actually* stab this unknown person which only goes by the name – "the son of a bitch" at the local chicken hut? Or, and with no victim, and no investigative record of the crime, does this statement belong to yet another chapter of the fiction given by Salvador? The outcome of all of this is that there is no way to know any of it.

***The allegation of advice***

Next, on the issue of Duggins advising Salvador not to kill with Lopez, assuming again it can just be outright credited as true, we still need to look at the statement in its' proper context. A review of the statement in total sounds like a gossip-session between two members of MS-13,

and where they are disparaging a third member.  Context always matter in a conversation
between two people, and the government only provides snippets of this discussion to try and
control the narrative on what the Court should hear.  See the following conversation in total:

| | |
|---|---|
| SALVADOR: | MAYIMBU'S girl is in jail. |
| CW-13: | Why? |
| SALVADOR: | Because she was driving with a bad license.  When UI was around, she wasn't in jail. |
| CW-13: | But she didn't see the boy. Only if he UI and told her, to impress her. |
| SALVADOR: | ROCA told her, doggie. |
| CW-13: | To show off? |
| SALVADOR: | The girl went to see him and she sked him what we were going for. She had seen him. |
| CW-13: | No. |
| SALVADOR: | I heard that the girl was telling him, I heard she told him, **I regret having killed with that dude.** |
| CW-13: | With whom? |
| SALVADOR: | With MAYIMBU. Without UI that girl there |
| CW-13: | UI the fuck up, dude. |
| SALVADOR: | "How could he trust that girl, those two girls doogie, that dude. [Duggins] always told me, "Look when you go kill a son of a bitch, dude, invite any other dude except MAYIMBU, dude. I wouldn't go kill someone with MAYIMBU, he told me, "even if they paid me!"  The problem with MAYIMBU is that he has a big mouth.  When he's drunk, he likes to talk about stuff to show off to the girls.  One time, the girl that was coming, the girl that's would bring her son, that girl wanted to introduce those guys, the girl that's would bring her son, that girl wanted to introduce those guys, because she knew he was a son of a bitch, dude.  The guys respected that girl because she was very quiet.  She likes those conversations UI.  She brought her sister, she brought her sister |

> and two more girls, and two more girls. So MAYIMBU was showing off stuff, dude, for the girls to see.  He was a fucker.  He would pull out his wallet, dude, he was drunk."

*See pages 33-34 of the Salvador Gutierrez transcript jail recording of October 24, 2018.*

When considering the whole conversation, the subject matter appears to be more about Erick Lopez than it is about Duggins.  Salvador expresses regret about having killed with "Mayimbu".  As far as Duggins is aware however, the only person the government has alleged Salvador killed (with Mayimbu) is Herson Rivas – the homicide which the government concedes Mr. Duggins was not aware.  One could therefore equally draw the inference that Duggins made some statement to Salvador, giving his two cents about a crime that somebody else *already* did.  *See id.* at ¶ 118.  (The morning after the Rivas stabbing, Duggins has approximately 3 phone calls with Salvador).   This is not to say that Duggins and Salvador discussed the murder during these morning-after conversations, but rather and "if" the Court credits that Duggins gave Salvador this "killing advice", we don't know *when* exactly the statements were made by Duggins.

In other words, if Duggins made this statement to Salvador *after* the Rivas murder, it only provides an "after the fact" perspective on Salvador's criminal behavior – not helpful on any agreement "before the fact".  The concept of relevant conduct needs more than Duggins merely knowing of Salvador's criminal acts.  *See United States v. Patriarca,* 912 F. Supp. 596 (D. Mass. 1995) (Wolf, J.) (In terms of assessing relevant conduct, "[I]t should be recognized that a defendant's knowledge of another participant's criminal act is ***not enough*** to hold the defendant responsible for those acts").  Without considering its' proper context, we just don't know if Duggins' alleged comments were made as a mere observer of what Salvador did (in killing with Mayimbu), or more.   Again, we must not forget that Duggins did not know about this crime

*before* it was committed. *PSR* at ¶117.  The evidence is therefore not clear that Duggins approved of any behavior such of this, but only commenting "after the fact' about Salvador's behavior – much like a family member tells another who gets arrested for drunk driving – "You never should have taken the field sobriety tests.  I would never take those field sobriety tests!. . etc.".

However, and whether this Court accepts or rejects the analogy above, the ultimate reason why Salvador made any statements on this point was to emphasize that Mayimbu has a "big mouth", and followed suit himself – outing Mayimbu (and clique business) to CW-13, complaining about how Mayimbu told his girlfriend about the Rivas murder.  At any rate, Salvador appears to throw Mr. Duggins' name in for additional emphasis during his gossip session, claiming that Duggins said the following:

*"well, I wouldn't kill with him, even if you paid me"!*

*Salvador Transcript at page 34.*

This comment has the scent of trash-talk, and as far as Duggins' is concerned, is not even supported by the evidence.  The last time Duggins has checked his PSR, we see NO evidence that he has killed anyone, and so if he is talking to Salvador about killing (as if he has done it before), who exactly would that be?  The problem with all of this totem-pole hearsay/gossip/ trash-talk – is not only that it comes from the mouth of Salvador, but the government also seeks a conclusion that it speaks for the state of mind of Duggins. With human communication we should not be able to take blanket leaps with the words of others, as there can be much room for translation, and even further room to get lost in it.  Again, we don't know even know if Salvador is actually even quoting Duggins, or just throwing his name into the conversation to bolster his own criminal conduct.

Let us think about it in a more concrete way.   Imagine if the speaker on the recording was Djavier Duggins.  Upon listening, let's say we can hear him gabbing away about how "back in the day" when he did all his killing, he would leave Lopez in the hotel-room because he has a big mouth.  Furthermore, let's assume that Duggins also whined about making the regrettable mistake this time of killing with Lopez.  Lastly, and not only are all of these admissions on tape – but the government could prove that the murder actually happened?  If all of this were true then Duggins could not look elsewhere for the translation.  Take for example Mr. Castro, who is caught on tape running an East Coast Program meeting, speaking in flagrant terms, on pressing the full-court violent agenda of MS-13.[6]  We have none of that by way of evidence against Duggins.  Here, we only have the information coming from a 3rd person who not only lies, but lies to make himself sound good.  As a consequence we just can't credit what he says "on the papers".  Because on the papers, we can *assume* Salvador is a truthful person just as easy as we can *assume* he is not.  Without cross-examination of him however, this court does not have the necessary information to determine which is the "most-likely" assumption.

**E.  The government's suggested enhancement for use of a minor.**

Mr. Duggins relies upon his previous arguments and objections to serve as a standing objection here – that he should also be enhanced under U.S.S.G. § 3B1.4 for using or attempting to use a minor in the commission of the "offense".  To be sure, Duggins is not aware for which "offense" the government is talking about.  Perhaps its "conspiracy to commit murder".  But murder of whom?  Rivas?  Other cooperators?  Gang rivals?  Duggins is still waiting for these people to be identified.

---

[6] For a more in-depth look at this recording, if this Court would like to review it, it had been filed with Castro's indictment, as *dkt entry* # 1107 at attachment 1.

**F.  Final points on leadership enhancement.**

      Duggins seeks to close out the enhancement controversy with just a few more final points on leadership.  The Salvador recording quite explicitly names Duggins as the "first-word" of the *Sykos* clique.  The government will also bolster Salvador's claim with scores of other MS-13 operatives (either cooperators or co-conspirator statements made unwittingly) who have also placed the same "first-word" title right into Mr. Duggins' lap.  This issue will not be ignored by Duggins of course, as he would expect this Court to ask him (via the undersigned) at sentencing the following question: "Why are all these people saying Duggins is the "first-word" of *Sykos* except Duggins?" The question does appear rationally based.

      In response to this perceived question, Duggins responds with an **admission** that he was considered the "first-word" of the clique between 2006 and 2012.  However, and to provide this Court with more contextual assistance, we know also know that after 2012 Duggins went to jail. Once Duggins is released from custody, what happens thereafter is either one of two conclusions, but where Duggins admits only one: a) because of Duggins' previous title of "first-word", coupled with his seniority status, the new installation of the *Sykos* clique (including Lopez) saw no better person (other than Duggins) to resume leadership, and had no problem representing that claim within the MS-13 community (but with a reckless disregard for its' truth); or b) Duggins did in fact resume leadership – and directed lower-level members to commit violence on behalf of the clique.   Obviously, we know Duggins' admits conclusion "1", but only by virtue of default actually – as the Rivas murder contradicts the version "2".

      Until the government can show convincingly however (even more likely than not), that Duggins directed lower-level members to commit violence on behalf of the clique, his leadership status is in doubt, no matter how matter how many people have claimed it.  There is a strong

inference here that clique members were reporting it because he was the most senior and the most intelligent, so who better else to say?   The government may call this all speculative, but Duggins has not seen any *evidence* which impeaches the notion that "coconspirator statements may suffer from exclusively self-serving motives". *See Davenport, The Confrontation Clause and the Coconspirator Exception in Criminal Prosecutions*: 85 Harv L. Rev. 1378, 1387 (1972). The issue therefore is to look into the minds of these people ("Sykos") and see how they represent themselves, including their self-serving behavior.   Once this is appreciated, one can see that there is not a word they say which can be trusted, or can be taken seriously.   For example, they violate human decency by taking an oath to kill cooperators, and then they themselves "cooperate" after they kill cooperators.   It's all just dumbfounding to say the least. Understanding therefore how these people think is not possible.  Only one thing is certain in all of this however – the people that killed Herson Rivas cannot be held in any high regard – and so it is within the realm of "probable" that they will say or do anything at any time, and for any reason.   In other words, we can impart no trust to anything they say.

  All of that said, one thing does appear to have a ring of truth – the people who have spoken all appear to have some higher regard for Djavier Duggins – fine.  Maybe they were told stories about how Duggins was in the "good ole days" – appreciating that the government cannot attribute one murder to Duggins during his past involvement with *Sykos.*  Accepting that any younger member would also accept this reputation premise who doesn't know any better, one cannot assume that they would not be inclined to cling to Duggins to exalt their own self-worth and strength.  See the following:

> "The conspirator's interest is **likely** to lie in misleading the listener
> into believing the conspiracy stronger with more members (and
> different members) and other aims than in fact it has.  It is no
> victory for common sense to make a belief that criminals are

notorious for their veracity the basis of law".

Levie, Hearsay, and Conspiracy: *A Reexamination of the Coconspirator Exception to the Hearsay Rule*, 52 Mich. L. Rev. 1159, 1165-1166 (1954) (emphasis added).

So, and in response to any question posed by this Court as to why anybody in *Sykos* would claim to any outside clique member who is interested in listening that Djavier Duggins is their first-word?   This is what coconspirators are "likely" to do – lie.  However, and the clique's supposed respect for Duggins aside, their lies about him being first-word become exposed.  For when it came to the Rivas murder, none of their intellectual worship of him is put into practice as there is no evidence that he: a) exercised any decision-making authority; b) participated in the commission of the offense; c) recruited any accomplices to commit the offense; d) claimed right to a larger share of the fruits of the crime; or e) planned or organized the offense. U.S.S.G. sec. 3B1.1. One would think the smartest guy in the room would weigh in on such a decision, and particularly if he "led" all the rest in 2018.  While Duggins concedes how he was looked at between 2006 and 2012, that is the only evidence we have to support why these younger members (and even Erick Lopez) all wanted what Duggins did not actually exemplify – leadership.

Now, and Duggins appreciates that his admission of his previous first-word status does come with potential consequence and therefore leaves us with a final query.   Will the government try at sentencing to use his admission to "enhance" him (under U.S.S.G. § 3B1.1) for this alleged title between 2006 and 2012, and argue once again for giving him the "Castro-treatment"?  The better query is can they?   Not according to the sentencing guidelines they can.

   (i) ***The title of first-word applied to Duggins (between 2006 and 2012) is not enough for a leadership enhancement – what is also needed is some action demonstrating leadership.***

Even though Duggins has admitted that he was perceived as the leader during the early years of *Sykos'* existence, he still holds the government to its' burden of proof that the title alone would qualify him for an "aggravating role" due to leadership under U.S.S.G. § 3B1.1.  Upon review of the language of the enhancement, 3 levels of aggravation are present: a) "if [Duggins] was an organizer or leader of a criminal activity that involved "five" or more participants, or was otherwise extensive, increase by **4** levels; b) if [Duggins] was a manager or supervisor and the criminal activity involved "five" or more participants or was otherwise extensive, increase by **3** levels; or c) if [Duggins] was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels".  *Id.*[7]

Where it would appear in 2006 through 2012 that Duggins' four-man clique was not a quorum of five, the only enhancement which would apply would be of the **2** level-kind.  This of course still requires proof by the government that he actually led or managed between 2006 and 2012 beyond the title – which the evidence has not yet shown.  However, and if the government proves some form of management (the "verb") beyond the title ("the noun") itself, he believes that only a 2 point enhancement would be appropriate, still contesting that any such leadership involves 1st degree murder, and still contesting that his leadership role embraced conspiracy to commit murder.

The argument above is merely based upon the hope that the Court does not concern itself with titles, but rather with actions.  See the following:

> "In distinguishing a leadership and organizational role from one of
> mere management or supervision, titles such as **"kingpin"** or **"boss"**
> are not controlling.  Factors the court should consider include the

---

[7] To be sure, these distinctions are not ceremonial. *See e.g., United States v. Rubio Sepulveda*, 781 Fed. Appx. 769 (10th Cir. 2019) (District Court clearly erred in applying 3B1.1 enhancement, even though Rubio-Sepulveda had *some* control or authority over others – the title must flesh out evidence that he possessed the sort of elevated "control, organization, and responsibility for the actions of other individuals" that is the gravamen of a 3B1.1(a) enhancement).

> exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

U.S.S.G.§ 3B1.1, note 4 (emphasis added).

As a result, and even if the government focuses upon Mr. Duggins' admission that he was perceived as the "first-word" of *Sykos* between 2006 and 2012, Mr. Duggins objects to the term of "first word" being used by the government as a verb instead of a noun.   The fact question of the day is one of action over title – whether he ran this clique – not whether others have given him the title of "king-pin" or "boss" in recorded conversations, done perhaps so as to give themselves credibility within the gang community. *Id. at ¶* 46 (Lopez, in 2015 claims that "Haze has always been the number 1. Do you know why? Because when you think you are one step ahead of that dude, he is three steps ahead of you!").

A graphic example of how the government should provide evidence of Duggins' actual leadership here should be taken from their efforts in *United States v. Herzzon Sandoval*, 1:15-cr-10338-FDS.  Upon review of the government's sentencing memorandum (*dkt no. 2760*), we see the following "evidence" against Sandoval:

> "As always, the meeting was led by Sandoval, the long-time "First-Word" or leader of the ESLS clique.  Two years before, the FBI secretly recorded Sandoval and his second-in-command, Edwin Guzman where they analogized they were the "Obama and vice-president of ESLS". . . Agents secretly recorded Sandoval running numerous ESLS clique meetings.  Sandoval called the meetings to order, recognized members to speak, and selected topics for discussion. Sandoval disciplined members who violated gang rules.  . . ."

*Id. at page 2.*

Here, the PSR makes no such allegations about these types of leadership activities engaged in by Duggins, and holds the government to its proof that Mr. Duggins was the

"Obama" of *Sykos,* and Erick Lopez was "Biden".  However, and assuming this dynamic duo

existed, to allow Erick Lopez to carry out presidential functions would not only contradict the

MS-13 constitution, but actually our own, as we presently know it.  See U.S. Constitution, Art. II

(Vice president assumes the powers of the presidency *only* "in case of the removal [ ] death,

resignation, or inability to discharge the powers and duties of the said office").  Upon review of

the PSR, no such condition precedent (Duggins' inability to rule during the Rivas murders) was

ever alleged to have taken place.  Once again ,we are seeing the government's leadership

allegation failing in magnanimous fashion, and with their request for a 20 year sentence to follow

also failing with similar intensity.

In sum, Duggins submits that the burden of proving the essential elements of each alleged

instance of relevant conduct is on the government.  Duggins also reserves his right to argue that

the standard of proof on relevant conduct is NOT by a preponderance of the evidence, but rather

clear and convincing.  *United States v. Peyton*, 353 F. 3d 1080, 1088 (9th Cir. 2003) ("The

application of the preponderance of the evidence standard, as opposed to the clear and

convincing standard, violate[s]. . . due process rights only if it le[ads] to the enhancements that

ha[ve] an extremely disproportionate effect on the sentence relative to the offense of conviction".

United *States v. Staten*, 466 F. 3d 708, 717-720 (9th Cir. 2006).  Duggins still maintains

however, that under either burden of proof the government cannot prevail.  As a result, the

defendant's base offense level must be a "19". [8]

---

[8] If this Court were to accept the government's recommendation of 20 years, and particularly (on the papers) where they are arguing inferential leadership, but without pervasive evidence of the same, it would seem "constitutionally suspect to drastically increase a Defendant's sentence, on conduct which was not proven beyond a reasonable doubt, nor to which the Defendant pled guilty.  *United States v. Magee*, 834 F. 3d 30 (1st Cir. 2016) (Torruella, J. concurring).

**G.  Criminal history category.**

Upon review of his overall criminal history, Duggins seeks a downward departure under U.S.S.G. § 4A1.3 – as his criminal history category of "V" substantially over-represents the seriousness of his criminal history, or the likelihood that the defendant will commit other crimes. Duggins specifically refers the Court to *paragraphs 170-171* in his PSR as being the root-cause of overstating his criminal history.  In those 2 paragraphs we see 2 separate convictions (where guilty findings were entered after he initially received a continuance without a finding) were entered on the same day for offenses that are either no longer crimes in the Commonwealth of Massachusetts, or no longer carry any period of incarceration.

For example *Paragraph 170* refers to a misdemeanor charge of possession of a class D substance, which has been decriminalized since 2008.  *See M.G.L.* ch. 94C § 32L ("Notwithstanding any general or special law to the contrary, possession of one ounce or less of marijuana shall only be a civil offense. . .").  *Paragraph 171* refers to a misdemeanor charge of disorderly conduct, where the charge does not carry any period of incarceration.  *See M.G.L.* ch. 276 § 53b (The potential punishment for the first offense of disorderly conduct or disturbing the peace is a maximum fine of $150).  Furthermore, and if Mr. Duggins happened to receive a sentence of less than 30 days for being a disorderly person, this offense conduct would be excluded from his CHC altogether.  See U.S.S.G. §4A1.2(c) (misdemeanor disorderly conduct not counted in criminal history calculation if received a sentence of less than 30 days).

From further review of Mr. Duggins criminal history, these two offenses were committed when he was 17 years old.  *Id.* at ¶¶ 170-171.  At the age of 18, Duggins admitted to sufficient facts and given a "CWOF" with probation.   As a result of violating his terms of probation, Duggins went into custody where the court gave him 4 months to serve for his violations.  In

today's world, none of this would have ever happened.   As a result, Mr. Duggins has received 3 points added to his criminal history score for this experience which has happened over 13 years ago. *Id. at* ¶¶ 170-171.  Furthermore, Duggins' last conviction for any crime (before the instant indictment) was 2012, and where he was released back into the community in 2016.  *Id. at* ¶ 173.   Thereafter, Mr. Duggins successfully completed stated probation, where he was terminated in 2018.  *Id.*   Of course, and because he could not "legally" establish that he withdrew from the enterprise, he has technically been in violation of the law for the instant federal indictment since 2006.  We also see that for that circumstance, he gets an additional two points under U.S.S.G. sec. 4A1.1(d).  *See also id.* at ¶175.   As a result, he believes that a category history "V" overstates the seriousness of his history, and would be seeking a downward departure.

## IV.

### Mr. Duggins Requests a Sentence Between the Range of 41 to 51 months, or would understand a sentence as high as 66 Months, But Both of Which Stands Firm After The Consideration of the Sentencing Factors Under 3553(A).

Mr. Duggins' PSR consists of over 240 paragraphs of information, and after he has responded with what he concedes as an overload of arguments to combat against it, Duggins will not intend to re-argue the same in this section.   He of course asks this Court to keep it all in mind however, and use it as a solidifying post to fabricate an appropriate sentence which is not greater than necessary to satisfy the goal of sentencing.  Although the sentencing guidelines are the starting point, and the initial benchmark for federal sentencing, consideration of all the section 3553(a) sentencing factors must also guide the sentence. *Gall v. United States*, 128 S. Ct. 586, 597 (2007).   However, and here, if the Court decides to sentence Duggins as a mere member of the recent installation of *Sykos*, and in lieu of a leader of *them* between 2016 and 2018, then the sentencing factors of Duggins' personal history alongside the deterrence and

public protection/interest considerations, will not serve to aggravate it.

Congress, and via the sentencing guidelines, has already demarcated what a member of a RICO conspiracy should receive (short of any enhancements) for a sentence – depending on where they fall on sentencing grid.  *Whalen v. United States*, 445 U.S. 684, 689 (1980) ("[T]he power to define criminal offenses and to prescribe the punishments to be impose upon those found guilty of them [ ] resides wholly with the Congress").  Duggins takes liberty to assume that issues of deterrence and the public interest were factored into the calculation.   As far as public protection, we have seen no act of violence committed by Mr. Duggins in over 10 years – not even via some disciplinary report in jail.   It is true that it has been alleged that Duggins was involved in some incident at the Wyatt Detention Center where he alleged to have spoken of avenging the work of CW-13, when this cooperator secretly recorded Salvador Gutierrez.  *See PSR at* ¶¶128-129.   Duggins however, objects to the factual circumstances in both of these paragraphs and holds the government to its' proof.  Mr. Duggins also incorporates by reference the arguments made in *dkt entry* 146 – which was filed under seal with this Court on or about April 29, 2020, to rebut the aforementioned allegation.  Duggins maintains he presents no risk to community safety.

Actually, and the most graphic demonstration of his respect for community safety is that while he was in the community and working amongst us, all was peaceful in his life and the lives around him until he was *extracted* again, pursuant to his arrest in November of 2018.  However and since then, his former employer "still", and after knowing who he was, would be interested in bringing him back. *See the testimony of James Marcotte, owner of Select Airport Parking who testified at Mr. Duggins' detention hearing,* at exhibit 1.  To be more specific, when Mr. Marcotte was asked whether after knowing his past with MS-13, would he still be interested in

Mr. Duggins employ, let's look at his response:

> A.  Because I never had an issue with him, and to be quite honest with you, after
> reading all this stuff, that wasn't the Djavier I knew.

Again, more evidence of him "aging-out". If this Court chooses to read the entire

testimony, what we actually learn is that Mr. Duggins got the job as a "referral" from Kevin

Avelar, or as he is more infamously known – "Shadow". *Id. at page 55 line 15.*  After reading

Mr. Marcotte's testimony, the undersigned is not sure what more can be said – at least about

community safety.  Mr. Marcotte's gesture speaks volumes beyond the 240 paragraphs could

ever, and as alleged in Mr. Duggins' PSR.   This is because if the owner of Select Valet Parking

still wants to employ Mr. Duggins, believing his customers would be safe around whom he

perceives as a former gang-member, there could be no better evidence before this Court of any

concern is has over public safety.

Now and all of that said, and based upon all of the above as well, Mr. Duggins is not

trying to paint a portrait about him which is exaggerated.  Did Djavier Duggins belong to one of

the more violent racketeering enterprises in the world?  Yes he did.   After he was released from

jail for behaving violently, did he "abandon" MS-13 in any total sense?  No he didn't.   Did

Djavier Duggins continue to spend time with his life-long friends of Erick Lopez and "Shadow"?

Yes, he did.  Even moreso, did he appear to establish some relationship with the younger and

quite violent members?   Yes.  Lastly, and most important of them all.  Does Duggins have

remorse in his heart for what he was, and even moreso, for not just getting out of gang-life

altogether?   Yes.  But all of this still must be balanced against the notion that we have received

strong evidence that he was trying.  He wasn't airport attendant by day/MS-13 operative by

night.  He was airport attendant by day, father and partner by night – and where he was actually a

"tax-paying" citizen. *See testimony from detention hearing of Carla Valladeres, as* exhibit 2 (acknowledging the same at pages 72-73 ). [9]

However, and notwithstanding this full life, which had all sorts of admirable behavior, it would still seem that his life still had some room for his past. While one could argue that he was "retired" or "aged-out" from the violence, at the same time we know he still had some affection for some of its' members. *See PSR* at ¶ 124 (Duggins spoke with Lopez in jail in the weeks following the murder, where he inquired as to welfare of Lopez and the younger gang members). No matter how Djavier Duggins is psycho-analyzed however, the end result is that when it came time to do the unthinkable (the Rivas Murder) this caboose of a defendant is elsewhere. Any argument by the government which doesn't appreciate that inescapable fact, should therefore not be persuasive.

Duggins falls upon the mercy of this Court. He would think the evidence is strong to **disfavor** a 20 year sentence. The fact that the government is seeking so much incarcerated time might suggest that they assumed too much upon listening to the Salvador recording, and now must stand upon their initial decision that Duggins led this clique at the time, despite finding out "after the fact" that Duggins was excluded from knowledge and/or participation of the Rivas murder. To be sure, and after he is sentenced, Duggins is not looking for the jail gates to open. He is however seeking that this Court grant him some real opportunity to continue on with exercising the goals and responsibilities which he was trying to accomplish.

## CONCLUSION

For the above reasons, the Defendant prays the Court's judgment and sentences him to the high end of the guidelines which Duggins has perceived – 51 months. If this Court believes that it should upward vary, than no more than 66 months.

---

[9] Duggins has actually copies of the same (for 2017 and 2018) but did not think it appropriate to file those on the *ecf*.

DJAVIER DUGGINS
By his Attorney,

/s/ Gordon W. Spencer
Gordon W. Spencer, Esq.
BBO #630488
945 Concord Street
Framingham, MA 01701
(508) 231-4822

Dated:    December 22, 2021

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel of record this 22st day of December, 2021 via electronic transmission

/s/ Gordon W. Spencer
Gordon W. Spencer, Esq.